Jerry ALEXANDER; Tyrone Brown, Plaintiffs–Appellees,

v.

COUNTY OF LOS ANGELES, Defendant,

and

Brian Wilson; Harry Toluchanian; Orlando Atencio; David Smiley, et al., Defendants–Appellants.

Jerry ALEXANDER; Tyrone Brown, Plaintiffs–Appellees/Cross–Appellants,

v.

COUNTY OF LOS ANGELES; Orlando Atencio; Brian Wilson; Harry Toluchanian; David Smiley; Philip Solano, et al., Defendants–Appellants/Cross–Appellees.

Nos. 94–55243, 94–55648.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 12, 1995.

Decided Aug. 29, 1995.

---

**7.** The *Cruz* court considered the same version of this statute as involved in this case. *Cruz,* 50    F.3d at 715 n. 1.

Edward M. Fox, Klass, Fox, Helman & Ross, Los Angeles, CA, for plaintiffs-appellees-cross-appellants.

Maureen Houska, Carol D. Janssen, and Scott D. MacLatchie, Franscell, Strickland, Roberts & Lawrence, Pasadena, CA, for defendants-appellants-cross-appellees.

Before: LAY,* BRUNETTI and RYMER, Circuit Judges.

LAY, Circuit Judge:

This appeal presents two basic issues: (1) whether the district court erred in denying qualified immunity to Los Angeles police officers involved in the detention and alleged arrest of the plaintiffs, Jerry Alexander and Tyrone Brown; and (2) whether the district court properly granted summary judgment in favor of the officers on Alexander's claim that the officers used excessive force.

*FACTS*

On August 17, 1992, a robbery took place in the Security Pacific Bank parking lot at 1633 North Hacienda Boulevard, La Puente, California. The Los Angeles Sheriff's Department received a call that shots had been fired. When Deputy David Smiley arrived at the scene, a witness described the robbery suspect as a Black male, five feet and eleven inches tall, 190 pounds, twenty-five to thirty years old, with short hair, a moustache, and a receding hairline. He was wearing a blue and white striped shirt and black pants and had a gold tooth. The witness reported the robbery suspect left the scene with another Black male in a newer model, green, two-door Chevy Baretta, with partial license plate number ZBSD7. The suspects had fired shots at a witness as they were leaving the area. Deputy Smiley put out a preliminary crime broadcast to all units with a description of the suspects, the suspect's vehicle, and a warning that the suspects possibly were armed.

Deputy Solano was next to arrive on the scene. The victim of the robbery told Depu-

---

* Honorable Donald P. Lay, Senior Circuit Judge    for the Eighth Circuit, sitting by designation.

ty Solano that she had been robbed and gave a description similar to that given by the witnesses. The woman stated that the robber grabbed her head, threw her to the ground, took a money pouch out of her hand, and fled. Deputy Solano initiated a radio and teletype broadcast to all units.

About forty minutes after the robbery, as Deputy Smiley was searching for the suspects in the general vicinity of the crime, he observed two Black males in a teal green, four-door Pontiac Grand Am. The passenger in the car was wearing a blue and white striped shirt. In checking the license plate number, the officer found it did not match the number provided by witnesses, but that the car was an Avis rental car. Deputy Smiley nevertheless began following the vehicle because it had been his experience that suspects often modify or change the license plates on their vehicle to facilitate escape.

Deputy Smiley advised other officers by radio that he needed assistance for a high-risk traffic stop. Subsequently, the vehicle was stopped and surrounded by several police officers with their weapons drawn, including all of the defendants. Jerry Alexander was the passenger in the car. At the time, he was a forty-five year old Black male, six feet tall, and weighing 155 pounds. He was wearing a blue and white striped shirt on the day in question. The driver of the car was Tyrone Brown, a twenty-three year old Black male, five feet and nine inches tall, 160 pounds, with a shaved head. Alexander and Brown were handcuffed and placed in the back of a patrol car while the officers searched their vehicle. The search of the interior was conducted by several officers and revealed a checkbook on the rear floorboard on the passenger side bearing a female name. A woman's purse was also found in the car.

Brown indicated to the officers that he was on probation at the time of the incident. After a search had been made of the plaintiffs' vehicle, and while the plaintiffs were handcuffed and detained in the patrol car, two of the police officers left to bring back one of the witnesses to the robbery. The officers' testimony is that they were gone approximately ten minutes. Immediately upon arrival at the scene, the witness was asked to make an identification of Alexander and Brown and could not do so. Thereafter, both plaintiffs were immediately released.

The plaintiffs filed a suit against the police officers and the County of Los Angeles alleging a violation of their Fourth Amendment rights, specifically for an arrest without probable cause. The plaintiffs also claimed that the officers used excessive force in handcuffing them. The district court, in ruling on the defendants' motion for summary judgment based on qualified immunity, found the officers were not entitled to qualified immunity for the arrest because the officers lacked an objectively reasonable belief that their actions were lawful. The court, however, granted summary judgment to the County of Los Angeles on all claims, and further held that the officers' motion for summary judgment on the issue of excessive force should be granted. We now vacate the district court's denial of qualified immunity to the officers for the allegedly unlawful detention of the plaintiffs and reverse and remand with direction that the defendants are entitled to summary judgment.[1] We reverse, however, the district court's grant of summary judgment to the officers on the issue of whether they used excessive force against Alexander during the period of his detention.

## DETENTION

The district court found the specific right at issue was the right to be free from an unreasonable search and seizure and that right was "clearly established." It determined that it was reasonable for the officers to draw their weapons when stopping the plaintiffs as a precautionary measure and that action did not convert the stop into an unlawful arrest. The court further found that placement of the suspects in the patrol car, even though handcuffed, did not convert the detention into an arrest because the suspects were thought to be dangerous. The court concluded, however, that the detention of the plaintiffs in the patrol car for forty-five minutes to an hour converted the investigative stop into an arrest for which the officers

1. There was no cross-appeal by the plaintiffs as    to the dismissal of the County of Los Angeles.

did not have probable cause. The court emphasized that the automobile described by the witness to the robbery was not similar to the automobile stopped by the deputies. Although the colors of the two cars were similar, the vehicle described was a two-door Chevy Baretta and the vehicle stopped by the deputies was a four-door Pontiac Grand Am and had a different license plate. The court also found that the plaintiffs did not sufficiently match the description given by the witnesses to justify holding them for a witness identification. Based on this reasoning, the court found the officers were not entitled to qualified immunity and had violated the plaintiffs' Fourth Amendment rights.

■ We have previously outlined the appropriate inquiry when determining whether officers are entitled to qualified immunity for a Fourth Amendment violation: whether reasonable officers could have believed their conduct lawful under the clearly established principles of law governing that conduct. *Act Up!/Portland v. Bagley*, 988 F.2d 868, 871 (9th Cir.1993); *see also Anderson v. Creighton*, 483 U.S. 635, 641, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). In determining whether the law in question is clearly established, "[t]he operation of this standard ... depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." *Anderson*, 483 U.S. at 639, 107 S.Ct. at 3038–39. In this case, we find the district court erred in identifying the legal rule at issue as "the right to be free from an unreasonable search and seizure." As *Anderson* makes clear, the legal rule in question must be defined in a more specific manner. In *Anderson*, the Court explained as follows:

[O]ur cases establish that the right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant,

sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. That is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent. *Id.* at 640, 107 S.Ct. at 3039 (citations omitted).

■ Thus, in determining whether the law is well established, the issue as defined by *Anderson* is "the objective (albeit fact-specific) question whether a reasonable officer could have believed [the plaintiffs'] warrantless [detention] to be lawful, in light of clearly established law and the information the ... officers possessed." [2] *Id.* at 641, 107 S.Ct. at 3040. Our analysis, although somewhat related to the approach taken by the district court, looks not in terms of whether there was an arrest without probable cause, but rather whether the officers reasonably could have believed their conduct lawful in light of clearly established law and the totality of the circumstances. Under this approach, we find that the officers are entitled to qualified immunity.

■ There should be little doubt that the officers, based upon the description of the suspects given by the witnesses and the victim of the robbery, had reasonable particularized suspicion to make the high-risk traffic stop of the plaintiffs' vehicle. Although the license plates did not match, the vehicle was occupied by two Black males, one of whom had a moustache and was wearing a blue and white striped shirt like the suspect. In addition, as Officer Smiley pointed out, the Pontiac Grand Am has the same body type as the Chevy Baretta, and the vehicle was a similar color to the car described by witnesses. Before Officer Smiley stopped the car, he deter-

**2.** The primary concern in analyzing qualified immunity is whether the risk of monetary liability will inhibit officers in the discharge of their duties. The Supreme Court has expressed that concern as follows:

The qualified immunity standard "gives ample room for mistaken judgments" by protecting "all but the plainly incompetent or those who knowingly violate the law." [*Malley v. Briggs*,

475 U.S. 335, 341, 343, 106 S.Ct. 1092, 1096, 1097, 89 L.Ed.2d 271 (1986).] This accommodation for reasonable error exists because "officials should not err always on the side of caution" because they fear being sued. [*Davis v. Scherer*, 468 U.S. 183, 196, 104 S.Ct. 3012, 3020, 82 L.Ed.2d 139 (1984).]

*Hunter v. Bryant*, 502 U.S. 224, 229, 112 S.Ct. 534, 537, 116 L.Ed.2d 589 (1991).

mined that the car was a rental car and in his experience, criminals often use rented cars. It is important to consider as well that the officers were not eyewitnesses to the robbery and simply possessed the description of the suspects given to them by the victim and the witnesses.

■ Having established that the officers had reasonable articulable suspicion to stop the plaintiffs, we next consider whether under clearly established law, a reasonable officer should have known that stopping these men at gunpoint, handcuffing them, and detaining them in a patrol car for a witness identification was unlawful. It is well settled that when an officer reasonably believes force is necessary to protect his own safety or the safety of the public, measures used to restrain individuals, such as stopping them at gunpoint and handcuffing them, are reasonable. For example, in *United States v. Buffington*, 815 F.2d 1292, 1300 (9th Cir.1987), this Court held that "[t]he use of force during a stop does not convert the stop into an arrest if it occurs under circumstances justifying fears for personal safety." In *Buffington*, because the officers knew one of the individuals that they stopped to be a person with a violent criminal history, the fact that the men were stopped at gunpoint and forced to lie down did not exceed the bounds of a permissible investigative stop. *Id.*

■ Similarly, in this case, the officers had information that the robbery suspects had fired on a witness and thus had reason to believe the suspects were armed and dangerous. Thus, under clearly established law, the officers acted reasonably in ordering Alexander and Brown from their car at gunpoint. *See United States v. Jacobs*, 715 F.2d 1343, 1345–46 (9th Cir.1983) (holding that an investigative stop was not converted to an unlawful arrest when an officer ordered a female suspect from a car at gunpoint because a radio dispatch had described the suspects as "possibly armed").

■ Handcuffing Alexander and Brown also was not necessarily unlawful under clearly established law. In *United States v. Bautista*, 684 F.2d 1286, 1288–89 (9th Cir. 1982), *cert. denied*, 459 U.S. 1211, 103 S.Ct.

1206, 75 L.Ed.2d 446, 447 (1983), we found that handcuffing a suspect does not automatically turn a lawful investigative stop into a de facto arrest. Noting that "handcuffing substantially aggravates the intrusiveness of an otherwise routine investigatory detention and is not part of a typical *Terry* stop," we nevertheless found that use of handcuffs under the circumstances in that case did not convert the stop to an arrest. *Id.* at 1289. The detainees in that case were suspected of armed robbery, and use of the handcuffs was reasonable because it "eliminated the possibility of an assault or escape attempt during the questioning." *Id.* at 1290.

■ In addition, "there is no per se rule that detention in a patrol car constitutes an arrest." *United States v. Parr*, 843 F.2d 1228, 1230 (9th Cir.1988); *see also United States v. Manbeck*, 744 F.2d 360, 377–78 (4th Cir.1984) (holding placement of suspect in patrol car acceptable where inclement weather provided no other alternative), *cert. denied*, 469 U.S. 1217, 105 S.Ct. 1197, 84 L.Ed.2d 342 (1985). Although the placement of a suspect in a police car may exceed the boundaries of a lawful *Terry* stop in some circumstances, *see United States v. Ricardo D.*, 912 F.2d 337, 340 (9th Cir.1990), it is not clearly established law that placement of a suspect in a patrol car exceeds the bounds of a permissible investigative stop. We find that under clearly established law, a reasonable officer could have believed the investigative stop was "reasonably related in scope to the justification for [its] initiation." *Terry v. Ohio*, 392 U.S. 1, 29, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889 (1968).

The district court agreed that ordering the plaintiffs from their car at gunpoint, handcuffing them, and placing them in the patrol car did not violate clearly established legal principles. It found, however, that the length of the detention was unreasonable. In *United States v. Sharpe*, 470 U.S. 675, 686, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985), the Supreme Court refused to set any hard-and-fast time limit on the length of a lawful investigative stop, finding instead that whether the stop was too long depended on the circumstances of each case. As the Supreme Court observed, the question turns on

whether the officers "diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *Id.* at 686, 105 S.Ct. at 1575. In *United States v. Richards,* 500 F.2d 1025, 1028–29 (9th Cir.1974), *cert. denied,* 420 U.S. 924, 95 S.Ct. 1118, 43 L.Ed.2d 393 (1975), this Court found that a detention of over an hour was reasonable when necessary in order to bring a narcotics dog to the scene to confirm the officers' suspicions that the detainee was smuggling drugs.

Similarly, in *In re Carlos M.,* 220 Cal. App.3d 372, 269 Cal.Rptr. 447, 453 (1990), a California court of appeals held that the transportation of two handcuffed suspects in a patrol car to the hospital for a victim identification was within the bounds of a lawful investigative stop under the circumstances. In *Carlos M.,* the entire detention lasted roughly half an hour, and the court determined it was reasonable because the hospitalized victim was not available to come to the scene. *Id.,* 269 Cal.Rptr. at 454. Thus, the length of the plaintiffs' detention was not necessarily excessive under the relevant legal standards.

Under the totality of circumstances, we cannot conclude that a reasonable officer should have known that pointing weapons at these men, handcuffing them, and placing them in the patrol car exceeded the bounds of a permissible investigative detention. The most that can be said is that the law clearly established that handcuffing a suspect and placing him in a patrol car during an investigatory stop requires some reasonable justification. For example, in *Ricardo D.,* 912 F.2d at 341, this Court noted that "detention in a patrol car exceeds permissible *Terry* limits absent some reasonable justification." Similarly, in *Bautista,* 684 F.2d at 1289, this Court found "handcuffing . . . is not part of a typical *Terry* stop." *See also United States v. Del Vizo,* 918 F.2d 821, 825 (9th Cir.1990) (finding that where a drug-trafficking suspect did not resist arrest, officers exceeded the bounds of a permissible investigative stop by ordering him from his car at gunpoint and handcuffing him).

The critical question in this case therefore is whether a reasonable officer could have believed that these might be the men involved in the robbery and that it was therefore lawful to detain them, handcuffed in a patrol car, until an eyewitness could be brought to the scene to identify them. We conclude that, although it is undeniably a close question, a reasonable officer could have believed it was lawful to hold Alexander and Brown for positive identification. It is true that there were discrepancies between the witnesses' description of the assailants and the plaintiffs' appearance. The vehicles were different makes; the license plates did not match; Alexander was older and was not as heavy as described, and did not have a gold tooth. These factors undoubtedly influenced the district court in making its assessment of the case. On the other hand, Alexander and Brown matched the description of the suspects in that they were driving a similar car and Alexander was wearing a blue and white striped shirt and had a moustache. Moreover, other facts determined after the stop was made contributed to the officers' suspicions that the plaintiffs were involved in criminal activity. The vehicle was rented and was not leased in either of the plaintiffs' names. A woman's purse and checkbook were found in the car. Brown made comments to the police suggesting he had been bothered by them in the past and that he was on probation. In light of this particular factual context, we conclude a reasonable officer could have believed that holding the suspects for witness identification was lawful under the circumstances.

■ Whether an officer is entitled to qualified immunity under the Fourth Amendment is a fact-specific inquiry, and the reasonableness of the officers' conduct is tested by objective good faith under the circumstances. In the present case, the officers who effected the stop should not be tested by verifying complete accuracy of a detailed description, but only by a reasonable likelihood that the suspect fits the description of the perpetrator of the violent crime. The Supreme Court observed in *United States v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981), as follows:

The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as factfinders are permitted to do the same—and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.

We stress our decision in this case is *not* a license for officers to detain for long periods of time an individual who generally matches the description of a suspect when there are numerous specific negating factors. *Cf. Maxwell v. City of Indianapolis,* 998 F.2d 431, 434–35 (7th Cir.1993) (denying qualified immunity to officers when several specific negating factors should have convinced them the plaintiff was not the fugitive they sought). It was reasonable to believe it lawful to detain the men for identification in this case because there were several *specific* identifying features such as the blue and white striped shirt and the moustache, as well as the similar car, that justified the officers' (admittedly mistaken) suspicions that Alexander and Brown were the men they sought. In addition, the officers discovered certain additional facts after the initial stop that also aroused their suspicions. Our decision rests heavily on these particular factual circumstances and the fact that the qualified-immunity determination rests on different legal footing than the determination of the existence of probable cause to effect an arrest. Officers are entitled to qualified immunity even if they acted unconstitutionally, as long as a reasonable officer could have believed the conduct lawful.

It is indeed unfortunate that the plaintiffs were mistakenly apprehended and detained. There is no question that every innocent citizen would resent and feel wronged by the actions of the police officers in this case, who obviously made a mistake. The difficulty, however, is that police officers' duties necessarily involve inherent danger. Although they cannot recklessly or knowingly violate a citizen's rights, they nonetheless may act in an objectively reasonable and diligent manner in pursuing reasonable suspicion to apprehend perpetrators of crime. It is, as we have noted, unfortunate that innocent people sometimes may be detained. The officers, however, in diligently pursuing their duties in good faith should not have to fear harassing litigation or monetary damages as long as their conduct is objectively reasonable under the circumstances.

On this basis, we do not feel that it can be said, as a matter of law, that a reasonable officer would have knowledge that he or she was violating the clearly established constitutional rights of these plaintiffs by detaining them. We therefore hold that the district court erred in failing to grant summary judgment in favor of the officers on the basis of qualified immunity.

*EXCESSIVE FORCE*

The question of whether the officers are entitled to qualified immunity for any use of excessive force in effecting the arrest is separate and distinct from whether they are entitled to qualified immunity for the alleged arrest without probable cause. This Court has observed that the inquiry as to whether officers are entitled to qualified immunity for the use of excessive force is the same as the inquiry on the merits of the excessive force claim. *See Scott v. Henrich,* 39 F.3d 912, 914 (9th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 2612, 132 L.Ed.2d 855 (1995). We have held that although reasonableness is normally a jury question, "defendants can still win on summary judgment if the district court concludes after resolving all facts in favor of the plaintiff, that the officer's use of force was objectively reasonable under the circumstances." *Id.* at 915; *see also Graham v. Connor,* 490 U.S. 386, 396–97, 109 S.Ct. 1865, 1871–72, 104 L.Ed.2d 443 (1989).

In the present case, only the plaintiff, Jerry Alexander, has cross-appealed the grant of summary judgment in favor of the officers. Although we deem the issue close, we find that in resolving all factual disputes in favor of the plaintiff, it cannot be said as a matter of law that the officers' use of force was reasonable. Alexander claims that he was immediately handcuffed and forced to

remain handcuffed for forty-five minutes to an hour. He claims that he was slammed against a car, his legs kicked apart, and that he was carried and pushed into the back of the police car with his hands behind his back. Alexander told police officers that he was ill. Officer Atencio, who handcuffed Alexander, stated during his deposition that he remembered "grabbing [Alexander's] wrists so [he] could handcuff him and at that point [he] felt that [Alexander's] wrist was kind of mushy or soft around the wrist area and [Alexander] simultaneously stated that he was a dialysis patient." Atencio Deposition at 19.

Alexander testified during his deposition that he repeatedly asked that the handcuffs be removed or loosened because he was a dialysis patient and that, although Brown's handcuffs were readjusted, Alexander's request was initially denied. The police officers verified that Alexander was complaining about the handcuffs. Alexander claims his handcuffs were readjusted only after he had already been handcuffed thirty-five to forty minutes. His hands became swollen and turned blue. Nine months after this incident, when Alexander was deposed, his right hand was still swollen in that it had a walnut-sized protrusion on the back of it below the wrist. His right hand also remained numb, and he was not able to make a fist with it. We find that if these facts are believed by the jury, it could reasonably find that excessive force was used against Alexander. *See Palmer v. Sanderson,* 9 F.3d 1433, 1436 (9th Cir.1993) (denying qualified immunity to an officer who tightly handcuffed an elderly man and refused to loosen the handcuffs). Thus, under the circumstances, we feel that the defense of qualified immunity is not available to the officers on Alexander's excessive-force claim.

The judgment of the district court denying the police officers qualified immunity for the *unlawful detention is hereby reversed* and the case is remanded to the district court with directions that judgment should be entered in favor of the defendants on this issue. The judgment in favor of the police officers

on Alexander's claim of excessive force is hereby vacated and the cause is remanded for trial.

REVERSED and REMANDED.