**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Francisco MEZA–CORRALES,
Defendant–Appellant.**

**United States of America,
Plaintiff–Appellee,**

v.

**Ramon Lamark Bridges, Defendant–
Appellant.**

**Nos. 98–10341, 98–10342.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 11, 1999.

Filed July 16, 1999.

Richard B. Jones, Ralls, Valenzuela, Fox & Jones, Tucson, Arizona, for defendant-appellant Francisco Meza–Corrales.

Myrna Rodriguez, Law Office of Robert Hooker, Tucson, Arizona, for defendant-appellant Ramon Lamark Bridges.

Christina M. Cabanillas, Richard E. Gordon, and Anne E. Mosher, Assistant United States Attorneys, Tucson, Arizona, for the plaintiff-appellee.

Before: CHOY, MICHEL,[1] and THOMAS, Circuit Judges.

CHOY, Circuit Judge:

Francisco Meza–Corrales ("Meza–Corrales") appeals his jury conviction and sentence for conspiracy to possess and possession of cocaine with the intent to distribute, in violation of 21 U.S.C. §§ 846 and 841(a)(1), respectively. Ramon Lamark Bridges ("Bridges") appeals his guilty plea conviction and sentence for

---

**1.** The Honorable Paul R. Michel, Circuit Judge, Federal Circuit, sitting by designation.

possession of a firearm and ammunition after having been convicted of a criminal offense punishable by a term of imprisonment greater than one year, in violation of 18 U.S.C. § 922(g)(1). For the following reasons, we affirm the district court's decision as to Meza–Corrales but reverse as to Bridges.

### Factual and Procedural Background

On March 26, 1997, Drug Enforcement Administration ("DEA") agents began surveillance on a residence in Tucson, Arizona. After the DEA agents saw a man carrying a brown paper bag depart from the residence, they followed and continued to observe the man, who eventually was apprehended by several Tucson Police Department ("TPD") officers. The TPD officers discovered approximately $29,000 contained inside the bag within the man's car. The DEA agents then continued surveillance of the residence, during which time they observed several other vehicles drive to the residence and remain there for only a very short time.

At this point, DEA special agent John Gazzara ("Gazzara") contacted detective Brian Cleburn, who spoke with an assistant United States attorney about these matters. Gazzara then conferred with DEA special agent Grant Murray ("Murray") about the possibility of obtaining a search warrant for the residence. Because the several other vehicles that had left the residence had not been followed successfully, Gazzara and Murray felt that it would be sensible to request consent for a search and only if that request were denied, to try to obtain a search warrant.

After meeting at a nearby staging area, DEA agents and TPD officers drove to the residence in three undercover vehicles and two marked police cars. While the agents and officers were driving to the residence, they received a radio report from a surveillance agent warning that a vehicle, a green Blazer, had arrived at the residence. As the agents and officers arrived at the residence, they spotted a man, later identified as Bridges, standing by the Blazer,

leaning across its interior, and repeatedly sounding its horn.

Concerned for the safety of the arriving agents and officers, Gazzara parked his vehicle behind the Blazer to block any avenue of departure. And to stop Bridges from continuing to sound the Blazer's horn, DEA special agent Annette Campe ("Campe") pulled Bridges from the passenger's door of the Blazer, forced him in front of the Blazer, placed his hands onto the Blazer's hood, shifted him to the ground, handcuffed him, and then seated him next to the residence.

Another DEA agent then reached into the Blazer in order to turn off the ignition and the radio, the latter of which was blaring. As the agent leaned into the Blazer to do so, he noticed a semi-automatic handgun positioned on the floor mat of the front passenger's seat of the Blazer. The agent then searched the rest of the Blazer and uncovered another handgun under the driver's seat.

Campe and Murray then approached the front door of the residence. Through a transparent screen door, both observed Meza–Corrales's girlfriend, Charmaine Bayze Meza ("Bayze Meza"), inside the residence. With his weapon holstered, Murray called out to Bayze Meza in order to draw her to the front door. At first, Bayze Meza did not make any move but instead told the agents that her "husband" Frank was still in the rear interior of the residence, at which point Murray told Bayze Meza to call her "husband" Frank to the front of the residence. During this discussion with Bayze Meza, Murray learned from other agents that several individuals had been seen running from the back door of the residence. Eventually, Bayze Meza did walk to the front door, and without hesitating, Murray reached inside the doorway and pulled her outside.

Murray then saw Meza–Corrales appear from the rear interior of the residence. With his weapon still undrawn, Murray yelled at Meza–Corrales in order to draw

him to the front door of the residence. Meza–Corrales finally complied.

While Murray was speaking with Bayze Meza, Gazzara and Campe ran to the back of the residence where they spotted a man, later identified as Mark Simmons ("Simmons"), running down the street. He was sweating profusely and had a fresh cut on his hand. After being stopped and questioned, Simmons admitted that he had fled from the residence. During this same time, prior to Murray's own encounter with Meza–Corrales, another agent saw Meza Corrales run from the residence, to the fence behind the residence, and then back into the residence.

After both Meza–Corrales and Bayze Meza were outside of the residence, the agents conducted a protective sweep of the residence. The agents did so because neither the residence nor the vehicles parked there had been cleared yet and the agents feared that additional weapons and/or other individuals still might be present there.

At this point, Murray informed Meza–Corrales that the agents were conducting an investigation into narcotics sales that the agents believed were occurring at the residence. Murray then walked Meza–Corrales to the driveway of the residence and still had not handcuffed him by the time that Gazzara returned from catching Simmons. However, because the surrounding area had not been fully cleared yet, an unknown number of weapons and individuals were involved, and only a small number of law enforcement personnel were present, Gazzara then instructed Murray to handcuff Meza–Corrales. Gazzara also discussed with Murray whether they should try to obtain a search warrant at this point.

Meanwhile, DEA special agent James Garten ("Garten") spoke with Bayze Meza, who was standing outside the house and had not been handcuffed or otherwise restrained. Garten asked Bayze Meza who owned the residence, to which Bayze Meza initially responded that she owned the residence but later claimed that her mother actually owned the residence. Garten then asked Bayze Meza for her consent to search the residence, which Bayze Meza granted.

Garten then walked over to where Murray and Meza–Corrales were waiting. Together Garten and Murray asked Meza–Corrales biographical questions and asked for his consent to search the residence. At this point, Meza–Corrales refused to grant his consent. Murray was then told that Bayze Meza in fact owned the residence, which caused Murray to question Meza–Corrales about who actually owned the residence. Meza–Corrales said that Bayze Meza owned the residence but that he lived there as well.

During this time, Campe sat with Bayze Meza and explained to her what was happening and why Meza–Corrales was handcuffed. Bayze Meza herself still was not restrained in any manner and was permitted to walk to the bathroom by herself and to make telephone calls while she waited for the agents to decide what their next step would be. However, Bayze Meza started to become agitated when neighbors began to gather around the residence and to stare.

Having ascertained both Meza–Corrales's and Bayze Meza's positions on the issue of consent, Garten called an assistant United States attorney to inquire whether Bayze Meza's consent was sufficient to permit the search of the residence. The assistant United States attorney told Garten that the agents legally could rely upon the consent of a single resident.

However, to be sure that Bayze Meza still consented to the search, Garten again discussed this issue with Bayze Meza. This time, she said that while she wanted to get the search over with and to let the agents inside the residence, Meza–Corrales would get very angry with her and had struck her in the past and might do so again for defying him. Bayze Meza then requested that she be allowed to speak with Meza–Corrales, who was brought over to her by the agents.

At this point, Garten again spoke with Meza–Corrales and asked him whether he would consent to a search of the residence. During this conversation, none of the agents had their weapons drawn or made any kind of threat to arrest Meza–Corrales or Bayze Meza (although both of them testified to the contrary at the motions hearing). Meza–Corrales this time consented to a search of the residence and signed a consent form in the presence of the agents.

After Meza–Corrales had signed the consent form, Gazzara told Meza–Corrales that the agents believed that there was cocaine inside the residence and that if Meza–Corrales wanted to avoid any possibility of damage to the residence when the agents searched through it, then Meza–Corrales should show Gazzara where the drugs were located. Meza–Corrales showed the agents where two bags (approximately one-half of a pound) of cocaine were located. Subsequently, via their own search, the agents found a large sum of money in the master bedroom; and wrappings used to package cocaine, a substance commonly used as a dilution agent for cocaine, and a razor blade next to the substance, all located in the kitchen. During this period, Meza–Corrales made no oral statements, and none of the agents read him his *Miranda* rights because they believed that he had not been arrested yet and that there therefore was no need for such reading yet.

Once the agents had secured the two bags of cocaine and had escorted Meza–Corrales into the living room, they informed him that he was under arrest and immediately read him his *Miranda* rights. Meza–Corrales then invoked his right to speak with an attorney, at which point the agents ceased all questioning.

During the same period of time that the residence was being searched, DEA agent Mickelson was asking background questions of Bridges, who did not attempt to conceal his identity and asserted that he simply had been out for a ride with his friend Simmons. Bridges also claimed that he did not know who lived at the residence, did not have any money with him (which turned out to be true), and had a loaded and chambered handgun solely for his own protection against "a lot of bad guys out there." Prior to Bridges's making these statements, the agents had found two handguns inside the Blazer, one on the driver's side and another on the passenger's side (the one that had been loaded and chambered, with nineteen rounds of ammunition in its clip). The agents also had discovered a cellular phone, a pager, and a calling card inside the Blazer-all items that the agents knew to be commonly associated with drug trafficking activities. Upon further investigation, however, the agents were unable to trace the cellular phone, pager, and phone card that were found in the Blazer, to the phone inside the residence. And the agents were unable to connect Bridges's name with Meza–Corrales's phone record or with an item discovered inside the residence that the agents believed to be a drug ledger.

At Meza–Corrales's trial, the district court decided, *inter alia*, to deny his motion to suppress on Fourth and Fifth Amendment grounds all of the evidence that was obtained from the residence. After the jury found Meza–Corrales guilty of conspiring to possess and possession of cocaine with the intent to distribute, under 21 U.S.C. §§ 846 and 841(a)(1), the district court imposed a 120–month sentence, the minimum required by 21 U.S.C. § 841(b)(1)(B), in light of Meza–Corrales's prior conviction under Arizona law for solicitation to unlawfully possess cocaine.

Before his joint trial with Meza–Corrales, Bridges, along with Simmons, was offered an opportunity to plead guilty to violating § 922(g) and thereby to avoid being prosecuted for the other violations. Simmons pleaded guilty and was sentenced to thirty-six months in prison followed by thirty-six months supervised release. However, Bridges refused to plead guilty and thus was forced to stand trial with Meza–Corrales (who was charged

only with the first two counts) for possession of cocaine with the intent to distribute, conspiracy to possess cocaine with the intent to distribute, and use of a firearm in relation to a drug trafficking offense; and was scheduled to stand trial by himself for possession of a firearm and possession of ammunition by a convicted felon. Although Bridges was acquitted of the three counts for which he had stood trial, he eventually pleaded guilty to the two remaining counts for which he had not yet stood trial. His guilty plea followed the district court's denial of his motion to dismiss the superseding indictment that contained the two counts for which he had not yet stood trial.

The three bases for the two felon-in-possession counts as to which Bridges pleaded guilty were as follows. First, on August 30, 1988, Bridges had been sentenced by an Arizona court to a term of five-and-a-quarter years in prison for possession for sale of crack cocaine with a value over $250, a felony under Arizona law. Although the Arizona Department of Corrections had issued a certificate of absolute discharge to Bridges, effective September 24, 1993, Bridges had not requested this certificate until August of 1997 and had not made any affirmative application to the Arizona state courts to have his civil rights restored before August of 1997. According to the government's theory in the present case, that conviction, and the consequences under Arizona law of that prior conviction, provided the predicate for a conviction under federal law, 18 U.S.C. § 922(g)(1).

Second, on July 9, 1996, Pima County Sheriff's Department deputies had stopped Bridges's car after seeing it exit a park after the posted closing time. Bridges had been accompanied by a young woman under the age of eighteen. After providing the deputies with identification materials, Bridges had been asked whether there were any weapons inside his car, to which Bridges had responded that he kept a handgun (which already had been loaded) on the floor of his car. The deputies then had cited him for carrying a concealed weapon (a misdemeanor under Arizona law), contributing to the delinquency of a minor, and trespassing in a county park. Bridges later had pleaded guilty to the concealed weapon charge, had paid a $250 fine, and had forfeited his handgun. According to the government's theory in the present case, this incident was the first act for which Bridges could be convicted for being a felon in possession.

Third, the previously described incident involving Meza–Corrales, according to the government's theory in the present case, was the second act for which Bridges could be convicted for being a felon in possession.

As to the two felon-in-possession charges, the district court accepted Bridges's two guilty pleas and then sentenced him to a forty-six month prison term, the low end of the applicable sentencing guideline range. Bridges's sentence was based in part on an enhancement for possession of the firearm in connection with another felony offense, under U.S. Sentencing Guidelines Manual § 2K2.1(b)(5), and in part on a denial of a third one-point reduction for acceptance of responsibility, under U.S. Sentencing Guidelines Manual § 3E1.1(b).

### Discussion and Analysis

I. *Meza–Corrales*

1. *Lack of Taint as to, and Voluntariness of, the Consent to the Search*

a. *Standing to Contest Alleged Violations of Bayze Meza's Rights*

■ Meza–Corrales does not have standing to contest violations of Bayze Meza's rights. *See, e.g., United States v. Robertson,* 833 F.2d 777, 779 (9th Cir. 1987). Moreover, her rights have not been violated, for the same reasons (to be discussed below) that Meza–Corrales's own rights have not been violated.

b. *Legality of Meza–Corrales's Detention*

■■ The events depicted in the district court's decision demonstrate that the agents' detention of Meza–Corrales did not escalate into a full-blown arrest. The agents here sought merely to confirm (or to dispel) as quickly as possible their initial reasonable suspicions and took only those measures that were reasonable under the totality of the circumstances to effectuate that goal without any risk of harm to themselves or the public. *See, e.g., United States v. Sharpe,* 470 U.S. 675, 685–86, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985); *Washington v. Lambert,* 98 F.3d 1181, 1185–86 (9th Cir.1996). When we make such judgments, common sense and ordinary human experience rather than bright-line rules serve as our guide, and we recognize that "we allow intrusive and aggressive police conduct without deeming it an arrest in those circumstances when it is a reasonable response to legitimate safety concerns on the part of the investigating officers." *Lambert,* 98 F.3d at 1186; *accord Sharpe,* 470 U.S. at 685–86, 105 S.Ct. 1568.

Here, as found by the district court, the situation initially confronted by the agents was anything but safe. A relatively small number of officers was present, weapons had been found (and more weapons potentially remained hidden), fleeing persons were on the loose, uncooperative persons were inside the residence, and uncertainty prevailed. Under such conditions, the agents' initial actions, including temporarily detaining Meza–Corrales with the use of handcuffs while questioning him, were reasonable responses, and the encounter did not escalate into a full-blown arrest. *See, e.g., Allen v. City of Los Angeles,* 66 F.3d 1052, 1056–57 (9th Cir.1995) (citing several other authorities); *Alexander v. County of Los Angeles,* 64 F.3d 1315, 1319–21 (9th Cir.1995) (same). Moreover, even after the situation had been secured to some extent, there still was a legitimate need to detain Meza–Corrales until more agents arrived and to question him further until the agents had either confirmed or dispelled their initial reasonable suspicions about the activities in which he seemed to

have been personally involved inside the residence. And given these legitimate needs, it was entirely reasonable that the detention took from fifteen to thirty minutes. *See, e.g., Sharpe,* 470 U.S. at 685, 105 S.Ct. 1568; *Alexander,* 64 F.3d at 1319–21. The agents only were gathering information about the identities of the various persons who had been detained, Meza–Corrales's criminal history, who resided at the residence, and whether the residents would consent to a search of the residence.

■ As a *Terry* stop rather than a full-blown arrest, Meza–Corrales's detention was permissible so long as it was supported by the agents' reasonable suspicions that criminal activity had occurred or was about to occur. *See, e.g., United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). The following six facts highlighted in the district court's decision provide ample evidence that such support existed. (1) A person had received $29,000 in a brown paper bag at the residence earlier that same day. (2) Several cars had been observed to visit residence for only a very short time. (3) Upon the arrival of the agents at the residence, Bridges immediately had started sounding the horn of the Blazer for the apparent purpose of warning those persons who were inside the residence. (4) A loaded, chambered, and readily accessible handgun had been discovered inside the Blazer. (5) Two persons had been seen attempting to flee from the residence. (6) Bayze Meza and Meza–Corrales had hesitated before complying with the agents' requests that they exit the residence. Meza–Corrales's argument that Bridges's sounding of the horn of the Blazer, the discovery of loaded handguns, and the sighting of fleeing people, all had absolutely no connection with what was going on inside the residence and with the people who lived there, simply because they all physically occurred outside the residence, is patently ridiculous. Clearly, these six facts demonstrate that there was a reasonable basis for the agents to suspect that

Meza–Corrales was involved in criminal activity that had occurred or was about to occur inside the residence. *See, e.g., Allen,* 66 F.3d at 1056–57; *Alexander,* 64 F.3d at 1319–21.

### c. *Legality of the Initial Protective Sweep of the Residence*

■ The agents clearly had probable cause to conduct their initial protective sweep of the residence (as opposed to the full search that would be conducted later) by the time that they were in a position to do so. Once Meza–Corrales, Bayze Meza, Bridges, and Simmons had been apprehended and briefly questioned, the agents then had a reasonable basis to believe that criminal activity was about to occur or had been occurring inside the residence. The following facts were collectively more than sufficient for the formation of such reasonable basis: (1) the large sum of money within a brown paper bag seized from a man previously seen leaving the residence, (2) the heavy volume of unusual vehicular traffic outside the residence, (3) the posting of a well-situated (and well-armed) lookout outside the residence, (4) the well-timed (albeit ultimately unsuccessful) sounding of a vehicle's horn by the posted lookout, (5) the attempted flight of two persons, and (6) the reluctance of persons to comply with the agents' requests. *See, e.g., Sibron v. New York,* 392 U.S. 40, 66–67, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968) (noting that "deliberately furtive actions and flight at the approach of strangers or law officers are strong indicia of mens rea"); *United States v. $129,727.00 U.S. Currency,* 129 F.3d 486, 490 (9th Cir.1997) (noting that carrying a large amount of currency "by itself was strong evidence that the money was furnished or intended to be furnished in return for drugs") (quotation omitted). Quite to the contrary of Meza–Corrales's characterization, these acts were not consistent with normal behavior-with spontaneous (and possibly innocent) flight-but rather were consistent with a deliberate attempt to avoid detection and capture by the police.

Once the agents had probable cause to enter the residence, they were entitled to do so if they merely were conducting a protective sweep to ensure that no potentially dangerous persons were hiding inside the residence. *See, e.g., United States v. Gardner,* 627 F.2d 906, 909–11 (9th Cir. 1980). As described above, and as the district court found, the circumstances were such that the agents were reasonable in fearing that, as Meza–Corrales and Simmons had been doing, other persons might be running around inside the residence, carrying loaded handguns similar to those that were found with Bridges, and thereby posing a potential threat to the safety of the agents. And the circumstances also were such that the agents were reasonable in fearing that without immediate action on their part, other persons also might destroy evidence hidden inside the residence, thereby frustrating legitimate law enforcement efforts, which indeed was the clear intent of Meza–Corrales and Simmons.

Moreover, Meza–Corrales's argument that the agents themselves caused all of the conduct that they claim justified their search (and that the agents therefore should not be allowed to justify their search on that basis), is unsound. To accept such an argument would mean, as Meza–Corrales actually does suggest in his briefs, that the agents instead should have driven away from the residence when they realized that Bridges was attempting to warn people inside the residence and thereby was creating a potentially dangerous environment for law enforcement activity. And it simply was not the case here that the agents committed any acts that were unreasonable or that were deliberately intended to manufacture the need for a warrantless search of the residence. *See United States v. VonWillie,* 59 F.3d 922, 926 (9th Cir.1995). That the agents were somewhat prepared for a hostile reaction does not indicate that they were seeking to provoke such a reaction, and indeed, the fact that they were not completely prepared to secure the premises

after their initial search of it, suggests that they in fact did not expect such a reaction and therefore surely did not intend to elicit one.

### d. *Voluntariness of Meza–Corrales's Consent to a Full Search of the Residence*

██ The question of the voluntariness of Meza–Corrales's consent to a full search of the residence, is a factual one, which we need review only for clear error. *See, e.g., United States v. Morning,* 64 F.3d 531, 532 (9th Cir.1995). Moreover, that question needed to be answered in the first instance by the district court by means of its own evaluation of the totality of circumstances surrounding the granting of consent. *See, e.g., United States v. Alfonso,* 759 F.2d 728, 740 (9th Cir.1985).

██ In the present case, after weighing the appropriate factors, the district court found that the scale tipped in favor of finding that Meza–Corrales's consent was voluntary. After our own review of the record, we hold that the district court's factual finding was not clearly erroneous. *See, e.g., United States v. Spires,* 3 F.3d 1234, 1237 (9th Cir.1993); *United States v. Childs,* 944 F.2d 491, 496 (9th Cir.1991); *United States v. Tolias,* 548 F.2d 277, 278–79 (9th Cir.1977). It is true that the district court found that Meza–Corrales had been detained (pursuant to a *Terry* stop), had not been informed of his *Miranda* rights or his right to refuse to consent, and had been informed that the agents "[were] going to get a search warrant" and that the decision to get a search warrant "had already been made." However, the district court also found that, contrary to Meza–Corrales's testimony, the agents had not drawn their guns while questioning Meza–Corrales and Bayze Meza, had not ever pointed their guns at Meza–Corrales and Bayze Meza, and had not ever threatened to arrest Meza–Corrales and Bayze Meza if they would not consent to a search. And, more importantly, the district court also found that Meza–Corrales had signed the written consent form, had been questioned on his home ground, had known from his own experience that a

judge would have to approve the search before a search warrant could be issued, and had demonstrated by his prior refusal to consent that he knew that he had such a right-a knowledge that is highly relevant in our analysis of whether a consent is voluntary. *See United States v. Mendenhall,* 446 U.S. 544, 558–59, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). Moreover, we previously have held that even in the unfortunate absence of a search warrant, the existence of probable cause, as in the present case, lessens any need for us to deem that a consent was invalid on the basis of a police officer's statements regarding the obtaining of a search warrant. *See, e.g., United States v. Kaplan,* 895 F.2d 618, 622 (9th Cir.1990).

### 2. *Admissibility of the Non–Verbal Statements*

#### a. *Preservation of the Issue*

██ Contrary to the government's position on this matter, this issue has not been waived. At a broad level, the issue of *Miranda* warnings (or the lack of them) and the circumstances surrounding them, were mentioned at least indirectly during the suppression hearing. Moreover, Meza–Corrales's written memorandum in support of his motion to suppress, plainly mentioned and discussed at some length the issue of *Miranda* warnings. Therefore, since it is unlikely that the district court deemed that the issue had been waived simply because Meza–Corrales decided not to pursue the issue orally and specifically at the suppression hearing, we deem that the issue has been adequately preserved for appeal. *See, e.g., United States v. Khan,* 993 F.2d 1368, 1375–76 (9th Cir.1993).

#### b. *Harmlessness of Any Error Committed*

██ Even if any error was committed as to the admission of Meza–Corrales's non-verbal statements (which were obtained by the agents prior to their administering of *Miranda* warnings to Meza–Corrales), such error was harmless. *See,*

*e.g., United States v. Gonzalez–Sandoval,* 894 F.2d 1043, 1047 (9th Cir.1990). At trial, the government introduced a large amount of incriminating evidence that had been discovered throughout Meza–Corrales's house. *The presence of such an abundance of incriminating evidence* makes it more likely than not that, even in the absence of Meza–Corrales's non-verbal statements, the jury still would have found it to be unlikely beyond a reasonable doubt that Meza–Corrales did not notice and thereby did not know that some kind of illegal activity was occurring in his residence. Therefore, it is more likely than not that the jury still would have reached the same conclusion as to Meza–Corrales's knowledge of the cocaine, money, packaging materials, cutting agents, and drug ledgers, all of which were found in easily noticeable places inside the residence. Moreover, it also is more likely than not that, if the need to do so had arisen, the jury, in lieu of relying upon an inference based on the abundance and the ease of notice of the incriminating evidence discovered in the residence, would have inferred that Meza–Corrales knew about the incriminating evidence, on the basis of his attempted flight from the residence. Therefore, any error as to this *Miranda* issue that may have been committed by the district court (and in the first instance, by the agents) was harmless.[2]

### 3. *Imposition of Ten–Year Statutory Mandatory Minimum Sentence*

■ The district court imposed a ten-year mandatory minimum sentence pursuant to 21 U.S.C. § 841(b)(1)(B). That statute provides that "[if] a person commits such a violation [e.g., possession of cocaine with the intent to distribute] after a prior conviction for a felony drug offense has become final, such person shall be sentenced to a term of imprisonment which may not be less than 10 years." 21 U.S.C.

§ 841(b)(1)(B). The term "felony drug offense" itself is defined as "an offense punishable by imprisonment for more than one year under any law of the United States or of a state ... that prohibits or restricts conduct relating to narcotic drugs." 21 U.S.C. § 802(44).

Meza–Corrales was convicted in Arizona state court on June 22, 1995, of "SOLICITATION TO UNLAWFULLY POSSESS A NARCOTIC DRUG: COCAINE, NON-DANGEROUS, NONREPETITIVE CLASS SIX FELONY OCCURRING ON AUGUST 14, 1994, IN VIOLATION OF ARS 13–1002; 13–3408(A)(1) AND (B)(1)." A.R.S. § 13–1002 is Arizona's general purpose solicitation statute (i.e., it bans the solicitation of any criminal offense), while A.R.S. §§ 13–3408(A)(1) and (B)(1) are Arizona provisions that specifically prohibit the unlawful possession of cocaine. Thus, it appears that because Meza–Corrales did not actually possess any cocaine, the Arizona state court trial judge must have entered a judgment against Meza–Corrales solely on the basis of A.R.S. § 13–1002 and merely was seeking to clarify which criminal offense supplied the underlying basis for that judgment (i.e., the solicitation count), when he included the citations to A.R.S. §§ 13–3408(A)(1) and (B)(1).

Given such legal and factual backdrop, Meza–Corrales now argues that his conviction under Arizona's general purpose solicitation statute somehow does not meet the definition of a "felony drug offense" under 21 U.S.C. § 802(44). In support of his argument, Meza–Corrales cites *Coronado–Durazo v. Immigration and Naturalization Service,* 123 F.3d 1322, 1324–1326 (9th Cir.1997), which discusses then 8 U.S.C. § 1251(a)(2)(B)(i) (current 8 U.S.C. § 1227(a)(2)(B)(i)), which provided that any alien who has been convicted of "a violation of (or a conspiracy or attempt to

---

**2.** Moreover, once the agents had been granted Meza–Corrales's consent to a full search, they were free to search the entirety of the residence and quite surely would have discovered all of the incriminating evidence, even with-

out Meza–Corrales's statements, which were asked for and provided solely to avoid the trouble and cost (for all of the parties involved) of a full search of the residence.

violate) any law or regulation of a State, the United States, or a foreign country relating to a controlled substance may be deported."

However, that case is distinguishable from the present case because the statutory language relevant in that case differs in two significant respects from the statutory language relevant in the present case. First, in reaching the decision that Arizona's general purpose solicitation statute did not satisfy the relevant federal statute, we emphasized that the parenthetical language contained within that federal statute plainly limited "convictions for generic crimes that may result in deportation to conspiracy and attempt. Simply put, solicitation is not on the list." *Id.* at 1325. Here, however, the statutory language does not contain any list of generic crimes from which solicitation is excluded, and, in fact, as discussed next, the statutory language here does not seem to draw any distinction at all between specific and generic crimes.

Second, the statutory language in the present case reads slightly but significantly differently from the statutory language at issue in *Coronado–Durazo.* In that case, the phrase "relating to a controlled substance" was positioned immediately after the phrase "any law or regulation of a State, the United States, or a foreign country," such that it was clear that the former phrase directly modified the latter one. Thus, the law at issue (e.g., the Arizona generic solicitation statute) itself needed to have related to a controlled substance (i.e., the statute itself needed to have mentioned controlled substances). However, in the present context, the phrase "relating to narcotic drugs" is positioned immediately after an intervening phrase, "that prohibits or restricts conduct," such that it is clear that the former phrase modifies the term "conduct" rather than the terms "any law or regulation." Thus, in the present context, the law at issue itself need not relate to (i.e., make mention of) narcotic drugs

but only need mention (for purposes of prohibition and restriction) some conduct that itself relates to (i.e., involves the use, possession, or sale of) narcotic drugs. Thus, only a strained reading of the statutory language here would support Meza–Corrales's argument (e.g., modifying the statutory language to read "any law ... that prohibits or restricts conduct, which *law* relates to narcotic drugs" or perhaps "any law ... that *by itself* prohibits or restricts conduct relating to narcotic drugs"). And here, Arizona law clearly satisfies the language of the federal statute, plainly read-to wit, A.R.S. § 13–1002 prohibits the solicitation of any criminal offense, which includes, among many other kinds of conduct, conduct involving the unlawful possession of narcotic drugs, such as cocaine.

Therefore, we conclude that the circumstances of *Coronado–Durazo* are distinguishable from those of the present case and hence that the district court did not err when it imposed a ten-year mandatory minimum sentence pursuant to 21 U.S.C. § 841(b)(1)(B).

## II. *Bridges's Sole Issue–Dismissal of the Felon–in–Possession Counts* [3]

■ The district court held that Bridges violated 18 U.S.C. § 922(g), which states that it is "unlawful for any person ... who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year ... to ... possess ... any firearm or ammunition," and which is further explained by 18 U.S.C. § 921(a)(20), which states in pertinent part that:

> Any conviction ... for which the person ... has had civil rights restored shall not be considered a conviction for purposes of this chapter, unless such ... restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms.

---

3. By use of the term "felon," we mean to indicate any individual convicted for a criminal offense that carries a prison sentence greater than one year.

Thus, in deciding whether Bridges could be tried for a felon-in-possession count, the district court performed a two-step analysis: (1) determining whether Bridges's civil rights had not been restored under Arizona law; but (2) if a restoration was found to have occurred, determining whether Bridges's right to possess a firearm nonetheless somehow still was restricted in an express manner under Arizona law. If the district court determined that either of these two conditions had been met, then the district court rightly could convict Bridges for being a felon-in-possession. And in making these two determinations, the district court looked, as it should have looked, *see, e.g., United States v. Collins,* 61 F.3d 1379, 1382–83 (9th Cir.1995), to Arizona law as of September 24, 1993, the date that Bridges's civil rights finally were restored.

Under Arizona law, from the time of Bridges's conviction, August 30, 1988, until the time of his absolute discharge, September 24, 1993, the following statutory scheme existed:

- A.R.S. § 13–904(A) provided that:
  A conviction for a felony suspends the following civil rights of the person sentenced:
  1. The right to vote.
  2. The right to hold public office of trust or profit.
  3. The right to serve as a juror.
  4. During any period of imprisonment any other civil rights the suspension of which is reasonably necessary for the security of the institution in which the person sentenced is confined or for the reasonable protection of the public.

- A.R.S. § 13–3101 provided, in pertinent part, that:
  6. "Prohibited possessor" means any person:

  .    .    .    .    .

  (b) Who has been convicted within or without this state of a felony involving violence or possession and use of a deadly weapon or dangerous instrument and whose civil rights have not been restored.
- A.R.S. § 13–912 provided that:
  A. Upon completion of the term of probation, or upon absolute discharge from imprisonment, and upon the completion of payment of any fine or restitution imposed, any person who has not previously been convicted of any other felony shall automatically be restored any civil rights which were lost or suspended by the conviction.
  B. This section does not apply to a person's right to possess weapons as defined in § 13–3101 unless he applies to a court pursuant to the procedures of § 13–906.

The government argued, and the district court agreed, that at the time of Bridges's absolute discharge, his right to bear firearms was restricted under federal law, regardless of the potential lack of any restriction under Arizona law. The government reached this position by first conceding that Bridges's civil rights had been substantially restored under step (1) of the analysis that was required under 18 U.S.C. § 921(a)(20),[4] but then arguing that the expressly limited nature of the resto-

---

4. This concession is in accordance with the law of the Ninth Circuit. Here, Bridges clearly had lost and had restored to him, his three core civil rights-the right to vote, the right to hold public office, and the right to serve as a juror. And that restoration clearly constituted a substantial restoration of Bridges's civil rights for purpose of step (1) of the analysis required by 18 U.S.C. § 921(a)(20). *See, e.g., United States v. Gomez,* 911 F.2d 219, 220–21 (9th Cir.1990). The fact that Bridges's right to bear firearms arguably had not been restored (since it never

had been lost to begin with), simply was not relevant for this step of the analysis. *See id.; see also United States v. Andaverde,* 64 F.3d 1305, 1309 (9th Cir.1995).

Moreover, to the extent that A.R.S. § 13–912(A) provides for automatic restoration by operation of law of a past first-time felon's civil rights, the fact that Bridges (seemingly a past one-time felon) did not obtain a certificate of absolute discharge until quite recently is of no legal consequence. *See, e.g., Gomez,* 911 F.2d at 221.

ration of Bridges's civil rights (as opposed to his right to bear a firearm) under Arizona law somehow warranted a conviction under step (2) of the analysis (i.e., met the statutory language in the "unless" clause of 18 U.S.C. § 921(a)(20)).[5]

However, as Bridges argues, and as we agree, this argument makes absolutely no sense. Step (2) of the analysis requires that the state law that restores a past felon's civil rights, nevertheless expressly provide that the past felon still may not possess firearms (or some subset of firearms). Here, it is quite clear that under Arizona law as of September 24, 1993, no such express provision existed. *See, e.g., State v. Olvera,* 191 Ariz. 75, 952 P.2d 313, 314 (1997) (noting that "[t]he *statutory change* [in 1994] made [the appellant] a felon whose right to possess a firearm was suspended") (emphasis added). A.R.S. § 13–904 did not suspend the right to possess a firearm at all,[6] and A.R.S. § 13–3101 only prohibited possession of a firearm by past felons who had been convicted of felonies involving violence or the posses-

sion and use of a deadly weapon or dangerous instrument.[7]

Moreover, although it is true, as the government points out, that A.R.S. § 13–912(B) expressly provided that A.R.S. § 13–912(A) did not apply to past felons so far as the automatic restoration of their rights to possess firearms was concerned, that provision had no relevance for step (2) of the analysis. That step requires that the state civil rights restoration law expressly provide that a past felon cannot possess a firearm (or some subset of firearms). However, Arizona law (A.R.S. § 13–912(B)) expressly provided only that the prior subsection dealing with the automatic restoration of civil rights generally, did not apply to a prior felon's right to possess a firearm. Arizona's civil rights restoration law did expressly provide that it would not restore a past felon's right to possess a firearm, but it did not expressly provide that he was prohibited from doing so if he had not lost the right previously (i.e., Arizona's restoration law did not give back anything that was formerly taken

---

**5.** The government cites *McGrath v. United States,* 60 F.3d 1005, 1006–10 (2d Cir.1995), which stands for the somewhat counterintuitive proposition that if a past felon has lost none of his civil rights and thus can possess a firearm under state law, he nevertheless can be convicted under federal law because his civil rights technically have not been "restored" to him (since he never lost them in the first place) under step (1) of the analysis required by a very literal reading of 18 U.S.C. § 921(a)(20). However, this citation to *McGrath* is problematic. First, *McGrath* has been disagreed with by a number of other circuits, including the one upon which the authors of *McGrath* initially relied, and including the Ninth Circuit (at least until the decision was vacated on other grounds). *See, e.g., United States v. Qualls,* 108 F.3d 1019, 1023 (9th Cir.1997); *United States v. Indelicato,* 97 F.3d 627, 629–30 (1st Cir.1996) (noting that despite a literal reading of the statutory language, common sense mandated that a past felon who never had lost his civil rights should not be treated more harshly than a past felon who had lost them). Second, the reasoning of the *McGrath* decision only can be relevant under step (1) of the analysis required by 18 U.S.C. § 921(a)(20). *See McGrath,* 60 F.3d at 1006–10 (focusing on the

term "restored"). Because the government has conceded that Bridges has met step (1) of the analysis, its citation to the *McGrath* decision is unhelpful in the present case.

**6.** This reading of former A.R.S. § 13–904 is bolstered by the fact that in 1994, the Arizona legislature deemed it necessary to amend the statute (into its present form) to prohibit possession of a firearm by any person who had been convicted of any felony.

Moreover, it should be noted that although ¶ 4 of former A.R.S. § 13–904 could be read to restrict a past felon's right to possess firearms, it appears that the Arizona courts have not read it to do so, *see, e.g., Olvera,* 952 P.2d at 314; that the Arizona legislature did not read it to do so; that both parties here do not read it to do so; and that the restriction on the right to possess firearms contained in that provision expires by its own terms (without any reliance on a separate restoration provision) once a convict is released from prison.

**7.** This reading of former A.R.S. § 13–3101 is bolstered by the fact that in 1994, the Arizona legislature deemed it necessary to amend the statute (into its present form) to prohibit possession of a firearm by any person who had been convicted of any felony.

away, but at the same time, it did not take away anything that was not formerly taken away). The legislative history of the 1988 amendment that created A.R.S. § 13–912(B) also supports this reading. The legislative history mentions this provision having some effect only in the context of past felons who had committed crimes involving violence or the possession and use of a deadly weapon or dangerous instrument-the only context that should have been relevant at all for this provision, given the above reading, because only past felons who had committed such crimes would have lost their rights to possess firearms under then-existing A.R.S. § 13–3101 and therefore only such past felons would have needed to avail themselves of this provision. Furthermore, prior to a 1994 amendment (which coincided with the 1994 amendments to A.R.S. §§ 13–904 and 13–3101), A.R.S. § 13–906 did not yet include a procedural mechanism for a past felon who committed a crime other than a dangerous offense to apply for a restoration of his right to possess a firearm, which omission can make sense only if such past felon's right to possess a firearm was not restricted under then-existing Arizona law.

In response, the government cites *Caron v. United States*, 524 U.S. 308, ——, 118 S.Ct. 2007, 2011–12, 141 L.Ed.2d 303 (1998), where the Supreme Court held that even the most limited restriction under state law of a past felon's right to bear firearms (or any subset of firearms) is sufficient to trigger the application of the "unless" clause of 18 U.S.C. § 921(a)(20)

(i.e., to find some state law restriction under step (2) of the analysis), even if the state law restriction is so limited that the past felon's present offense conduct would not be within the ambit of the state law restriction and therefore would not sustain a conviction under state law. However, because, as discussed above, under Arizona law at the time of his absolute discharge, Bridges's right to possess firearms had not been restricted to any extent whatsoever, the holding of *Caron*, in spite of its expansiveness, does not control the present case.[8]

Therefore, the district court should have dismissed the superseding indictment on the grounds that Bridges's civil rights had been restored to him and his right to possess a firearm had not been expressly restricted to even the slightest degree under then-existing Arizona law.[9]

*Conclusion*

For the foregoing reasons, we affirm the decision of the district court with respect to all issues involving Meza–Corrales and reverse with respect to the denial of Bridges's motion to dismiss the superseding indictment.[10]

**AFFIRMED IN PART; REVERSED IN PART.**

**8.** In *United States v. Qualls*, 172 F.3d 1136, 1138 (9th Cir.1999) (en banc), we recognized "*Caron*'s binding interpretation of the federal felon-in-possession statute, and [applied] to [a criminal defendant] the all-or-nothing rule announced in *Caron*." However, that case required us to apply the *Caron* rule to a prior conviction under California law, which, unlike Arizona law, imposed some restrictions, as opposed to no restrictions, upon a past felon's right to bear firearms and thus triggered the application of the federal statute.

**9.** It is worth noting that the holding of our decision today is limited to the peculiar as-

pects of Arizona law prior to the date in 1994 on which the provisions at issue in the present case were substantially amended. However, it is also worth noting that despite the substantial amendment of the relevant provisions here, the holding of our decision today will continue to be relevant for all past felons who were convicted under Arizona law prior to the date in 1994 and who might be prosecuted in the future for being a felon-in-possession under federal law.

**10.** Our reversal of Bridges's conviction renders any consideration of his sentence moot.