**UNITED STATES of America, Plaintiff–Appellee,**

v.

**David TODHUNTER, Defendant– Appellant.**

No. 01–10374.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 6, 2002.

Filed July 18, 2002.

Rustam A. Barbree, Honolulu, HI, for the defendant-appellant.

Marshall H. Silverberg, Assistant U.S. Attorney, Honolulu, HI, for the plaintiff-appellee.

Before: WALLACE, TASHIMA and TALLMAN, Circuit Judges.

TALLMAN, Circuit Judge.

We must decide whether a sailboat was lawfully boarded in Lahaina Harbor by officers from three different agencies and whether its owner consented to a search of his vessel.

David Todhunter was convicted of (1) possession of marijuana in violation of 21 U.S.C. § 844(a); (2) being a convicted felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1); and (3) being a convicted felon in possession of ammunition in violation of 18 U.S.C. § 922(g)(1). The district court denied his motion to suppress evidence seized from the S/V GANDALF. We hold that the district court correctly denied the motion to suppress and affirm his conviction.

I

The district court conducted a two-day suppression hearing. The court found that on June 25, 1995, an anonymous caller telephoned both the United States Coast Guard and the Maui County Police Department. The caller stated that (1) he was taking his friend who had overdosed to a local hospital; (2) individuals on board the sailboat GANDALF moored in Lahaina Harbor were partying and taking drugs; and (3) the vessel's owner, Todhunter, had a weapon and an outstanding warrant for his arrest.

The officer in charge of the Maui Coast Guard station, Chief Boatswain's Mate Michael Leavitt, confirmed the presence in the harbor of a sailboat by that name and decided to board her to ensure that the GANDALF was complying with all federal rules and regulations. Because the Coast Guard was understaffed, he requested assistance from the Maui Police Department and the Hawaii Marine Patrol. Upon arriving at Mala Wharf in Lahaina, Maui, Chief Leavitt observed a dinghy near the GANDALF, which was moored approximately 200 yards off the wharf. Believing the occupants of the vessel were then aboard and might take flight, Chief Leavitt decided not to wait for the Maui police officers to arrive and instead put a Coast Guard Zodiak boat into the water and motored to the GANDALF. He was accompanied by Petty Officer James Vareha and a coxswain from the Coast Guard and Hawaii Marine Patrol Deputy Nelson Alana.

Upon reaching the GANDALF, Chief Leavitt told Todhunter the officers intended to board his vessel to ensure compliance with federal laws and regulations. In response to an initial question from Chief Leavitt, Todhunter denied having weapons on board. When asked to supply the names and dates of birth of everyone on board the GANDALF, Todhunter proceeded below to the birthing area to retrieve some paper and a pencil.

Maui County Police Officer Todd Wong came aboard shortly thereafter. Wong informed Chief Leavitt that his police department had confirmed the earlier anonymous reports by sending an officer to a local hospital, where he met and interviewed the individual who had overdosed on the GANDALF. That individual stated that the police would find liquid acid, or LSD, and marijuana aboard the vessel.

Officer Wong and Chief Leavitt then went below and questioned Todhunter.

The district court noted that there was considerable dispute in the testimony regarding the exchange between Officer Wong and Todhunter. The district court found it was clear that Officer Wong again asked whether Todhunter had weapons or drugs on board, identified himself as a member of the canine unit of the Maui Police Department, and suggested that his dog would be brought on board if necessary to locate any drugs.

Todhunter then acknowledged to Officer Wong that he had a weapon and he admitted to having marijuana on board. He pointed to a cabinet and indicated that was where the officers would find the weapon and contraband. Officer Wong seized the items and arrested Todhunter.

The district court found the boarding of the GANDALF lawful and Todhunter's consent to search voluntary. After a three-day trial, a jury convicted Todhunter of all three counts in the indictment. Todhunter timely appealed.

## II

■ We review the denial of a motion to suppress de novo. *See United States v. Dorais,* 241 F.3d 1124, 1128 (9th Cir.2001). We review the district court's underlying factual findings for clear error. *See United States v. Hinton,* 222 F.3d 664, 673 (9th Cir.2000). We may affirm the denial of a motion to suppress "on any basis fairly supported by the record." *United States v. Mariscal,* 285 F.3d 1127, 1129 (9th Cir. 2002) (citation omitted).

## A

■ We first address the jurisdictional aspects of this case. "The Coast Guard may make inquiries, examinations, inspections, searches, seizures, and arrests upon the high seas and waters over which the United States has jurisdiction, for the prevention, detection, and suppression of violations of laws of the United States." 14 U.S.C. § 89(a). Even without suspicion, Chief Leavitt, as a member of the United States Coast Guard, had the right to board the GANDALF in navigable waters to ascertain that the vessel was complying with all federal laws. *See United States v. Troise,* 796 F.2d 310, 312 (9th Cir.1986).

Situated approximately 200 yards offshore, the GANDALF was also within the concurrent jurisdiction of the Maui County Police Department. *See Civil Aeronautics Bd. v. Island Airlines, Inc.,* 235 F.Supp. 990, 1007 (D.Haw.1964), *aff'd Island Airlines, Inc. v. C.A.B.,* 352 F.2d 735, 740 (9th Cir.1965) ("[T]he boundaries of Hawaii were fixed at three nautical miles from the line of ordinary low water surrounding each and every one of the islands composing the State of Hawaii."). Maui County extends to the limit of the three nautical miles offshore that constitute the boundaries of the state. *See* County of Maui, Charter § 1–2.

■ Todhunter nevertheless argues that the evidence seized by Officer Wong should have been suppressed because the Coast Guard did not first obtain the consent of the Maui Police Chief to provide assistance. Todhunter contends that such consent is required under 14 U.S.C. § 141(b), which states:

The Coast Guard, with the consent of the head of the agency concerned, may avail itself of such officers and employees, advice, information, and facilities of any Federal agency, State, Territory, possession, or political subdivision thereof ... as may be helpful in the performance of its duties.

The district court found that "the Coast Guard had at least implied consent to uti-

lize personnel from the Maui Police Department and the Hawaii Marine Patrol."[1] It noted that the Coast Guard engaged in "extensive joint training exercises" with the Hawaii Marine Patrol; that the Coast Guard was so undermanned it often utilized officers from other agencies; and Officer Wong did not board the GANDALF until receiving a "direct order from his immediate supervisor." These facts all support the conclusion that the Coast Guard had the implied consent of the Maui Police Department.[2]

■ Even if we were to assume, however, that the Coast Guard needed the police chief's explicit consent or that the Coast Guard did not have implied consent for Officer Wong to assist the Coast Guard aboard the GANDALF, we would not suppress the evidence. Exclusion of evidence would not be the proper remedy where the statute exists to promote cooperation among governmental bodies, not as a basis independent of the Constitution for the protection of individual liberties. *See United States v. Lombera–Camorlinga,* 206 F.3d 882, 886 (9th Cir.2000) (en banc) ("[A]n exclusionary rule is typically available only for constitutional violations, not for statutory or treaty violations.").

■ Finally, Officer Wong was lawfully aboard the GANDALF regardless of Chief

Leavitt's request because he had reasonable suspicion that criminal activity was taking place within the Maui County Police Department's jurisdiction. *See generally Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). An anonymous caller stated he was taking a friend to a hospital who had overdosed on drugs while on board the GANDALF, that there were guns on board the vessel, and its owner was wanted. The Maui Police Department confirmed the anonymous report by interviewing at a local hospital the individual who had over-dosed, and that person stated that police would find liquid acid, or LSD, and marijuana aboard the GANDALF.

Once the anonymous tip had been corroborated by statements made against penal interest by an identified informant, Officer Wong had a right to board the vessel because he now had reasonable suspicion that a crime had been committed or was being committed. *See Dorais,* 241 F.3d at 1130 ("Reasonable suspicion is formed by 'specific, articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in criminal activity.' ") (citation omitted); *United States v. Maybusher,* 735 F.2d 366, 372 (9th Cir.1984) ("[A] boarding

---

1. It is not clear what role Hawaii Marine Patrol Deputy Nelson Alana played in the boarding of the GANDALF beyond merely being present to protect the boarding party and to assist if necessary. The Hawaii Marine Patrol is a state agency within the Hawaii Department of Land and Natural Resources ("DLNR"). Under state law, it has primary jurisdiction over coastal waters within Hawaii and, among other duties, regulates all vessels entering state waters or mooring at small boat harbors. Haw.Rev.Stat. §§ 200–2, 200–3 & 200–4. DLNR is authorized to conduct "marine inspections" of such vessels. *Id.* at § 200–13. DLNR enforcement officers "may exercise all of the powers and authority of a police officer, including the power of

arrest, and shall enforce all state laws and rules . . . within all state lands, state shorewaters and shores. . . ." *Id.* at § 199–4. Deputy Alana was lawfully aboard the GANDALF in his capacity as a state marine law enforcement officer with authority under Hawaii law that mirrored the powers of the United States Coast Guard to board and inspect a sailboat moored in Lahaina Harbor within 200 yards of Maui's shoreline. *Compare* Haw.Rev.Stat. § 199–3 *with* 14 U.S.C. § 89(a).

2. We assume, without deciding, that Todhunter has standing to challenge the Coast Guard's compliance with 14 U.S.C. § 141(b).

is a necessary element of many vessel investigatory stops ....”); *see also United States v. Thompson,* 282 F.3d 673, 678–79 (9th Cir.2002) (finding reasonable suspicion sufficient to detain a vessel stopped near the San Juan Islands on a known international smuggling route from Canada).

## B

█ The district court found Todhunter's consent to search the vessel to be voluntary. We review for clear error a district court's determination of the voluntariness of a defendant's consent to a search. *See United States v. Meza–Corrales,* 183 F.3d 1116, 1125 (9th Cir.1999).

Todhunter acknowledged the presence of a loaded firearm and contraband and consented to a search of the GANDALF by pointing at the areas of the cabin where the illegal items were located. He claims his consent was vitiated by the threat to bring the police dog on board. We have held that a canine sniff is not a “search” under the Fourth Amendment and thus “neither a warrant, nor probable cause, nor reasonable suspicion” is required for its use. *United States v. Lingenfelter,* 997 F.2d 632, 639 (9th Cir.1993). As such, Officer Wong, who in this case had reasonable suspicion, would have been justified in conducting a canine sniff of the GANDALF without asking for Todhunter's permission. We therefore reject Todhunter's claim that the lawful threat to employ a canine sniff made his consent to the search of his sailboat involuntary.

█ Furthermore, even without Todhunter's consent, we note that a canine sniff is only useful in aiding police officers in detecting contraband. Todhunter first admitted to Officer Wong that he had a gun on board. Only after voluntarily offering this information did he acknowledge the presence of drugs. Once Todhunter admitted the presence of a loaded weapon on board, Officer Wong had probable cause to search the vessel for it as well as a duty to secure the weapon for the protection of the boarding party. *See Adams v. Williams,* 407 U.S. 143, 148–49, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972) (holding that once an officer determines the truth concerning an informant's report of a weapon, probable cause exists to make an arrest, and the discovery corroborates the informant's further report pertaining to the presence of narcotics). The discovery of marijuana on board the GANDALF was incident to the search and seizure of the loaded weapon and was therefore admissible on this alternative ground. *See United States v. Mattarolo,* 209 F.3d 1153, 1158 (9th Cir.2000) (“[C]ontraband seized incident to a lawful *Terry* search is admissible....”); *United States v. Humphrey,* 759 F.2d 743, 748–49 (9th Cir.1985) (holding that a voluntary confession regarding weapons creates security considerations that permit an officer to conduct a search and seize the weapons, and any drugs discovered in plain view incident to such a search and seizure are admissible).

The district court properly denied the motion to suppress the evidence seized aboard the GANDALF. The initial boarding was lawful and the owner voluntarily consented to a search. The search was also justified by reasonable suspicion that ripened into probable cause. We affirm the resulting conviction.

**AFFIRMED.**