**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

v.

CASEY DALE MAYER,
            *Defendant-Appellant.*

No. 07-30274

D.C. No.
CR-05-60072-ALA

ORDER AND
OPINION

Appeal from the United States District Court
for the District of Oregon
Ann L. Aiken, District Judge, Presiding

Argued and Submitted
May 5, 2008—Portland, Oregon

Filed March 16, 2009

Before: Richard C. Tallman, Richard R. Clifton, and
N. Randy Smith, Circuit Judges.

Order;
Dissent to Order by Chief Judge Kozinski;
Opinion by Judge N.R. Smith;

3295

## COUNSEL

Craig E. Weinerman, Assistant Federal Public Defender, Eugene, Oregon, for the defendant-appellant.

Frank R. Papagni, Jr., Assistant United States Attorney, Eugene, Oregon, for the plaintiff-appellee.

## ORDER

The opinion in the above-captioned matter filed on June 30, 2008, and published at 530 F.3d 1099, is WITHDRAWN. The superseding opinion shall be filed concurrently with this order.

Having made the foregoing amendments to the opinion, all judges on the panel have voted to deny Defendant/Appellee's Petition for Panel Rehearing, and so that petition is DENIED.

The full court has been advised of Defendant/Appellee's Petition for Rehearing En Banc, and a judge of this court requested a vote on whether this case should be reheard en banc; however, a majority of the active judges did not vote in favor of en banc consideration. Fed. R. App. P. 35. Accordingly, the Petition for Rehearing En Banc is also DENIED.

Chief Judge KOZINSKI, with whom Judges REINHARDT and W. FLETCHER join, dissenting from the denial of rehearing en banc.

This is a train wreck in the making.

The panel cleaves a formerly uniform doctrine—the *Taylor* categorical approach—into two branches. One approach for most things; a separate, incompatible version for a single clause of the Armed Career Criminal Act. This approach is novel, difficult to administer and will encourage future panels to splinter the categorical approach into even smaller pieces. That's not all: The panel also reads ACCA's residual clause so broadly that nearly any crime will qualify. And it does so by embracing an argument that the Supreme Court rejected *this Term*, in an opinion on which the ink is barely dry. This is precisely the sort of case we need to take en banc in order to prevent serious damage to the fabric of our circuit law.

**1.** The categorical approach of *Taylor* v. *United States*, 495 U.S. 575, 600 (1990), has been applied with remarkable uniformity to many areas of law. It's used for ACCA; it's used for immigration; it's used for the Sentencing Guidelines. The inquiry in all of these areas is identical and elegant: Does the state offense reach conduct beyond the generic federal definition? The way we answer that question is by looking at state prosecutions to see whether any of them actually involved such uncovered conduct.

This case is about whether Oregon's first-degree burglary statute is a crime of violence. There are two ways that it could be. First, it could qualify as a generic *Taylor* burglary; second, it could fall under the statute's residual clause, which covers crimes that present a "serious potential risk of physical injury." The panel quickly recognizes that Oregon's burglary statute doesn't qualify as generic burglary. *United States* v. *Mayer*, 530 F.3d 1099, 1106 (9th Cir. 2008). The only

remaining question is whether Oregon burglary falls within the residual clause.

To determine whether this is the case, the panel needs to ask a simple question: Does Oregon's burglary statute only reach conduct that presents a "serious potential risk of physical injury?" And the right answer is obviously no: Oregon prosecutes as burglars people who pose *no* risk of injury to anyone. *E.g. State* v. *Keys*, 244 Or. 606 (1966) (upholding burglary conviction for entering public telephone booths to steal change from coin boxes). *Gonzales* v. *Duenas-Alvarez*, 549 U.S. 183, 193 (2007), held that an offender can show "that a state statute creates a crime outside the generic definition . . . in a federal statute" by pointing to "cases in which the state courts in fact did apply the statute" more broadly than the federal definition would reach. *Keys*, decided by the state's highest court, is such a case.

Instead of asking and answering this simple question, the panel comes up with a new, complicated question to ask: Do "[m]ost of the cases" under the state statute involve dangerous conduct? *Mayer*, 530 F.3d at 1108. Forget, for the moment, whether this inquiry has a basis in law. Don't even think about how a court is supposed to figure out whether a statute is applied in a certain way "most of the time." (A statistical analysis of the state reporter? A survey? Expert evidence? Google? Gut instinct?) Ask instead: Why should we *want* to fork the categorical approach into multiple branches?

A great virtue of the categorical approach has been its consistency across doctrinal areas. Immigration cases that explain it, like *Duenas-Alvarez*, can be applied to ACCA. *E.g. James* v. *United States*, 127 S.Ct. 1586, 1597 (2007) (citing *Duenas-Alvarez*). ACCA cases, like *Taylor*, can be applied to the Sentencing Guidelines. *E.g. United States* v. *Snellenberger*, 548 F.3d 699, 700 (9th Cir. 2008) (en banc) (citing *Taylor*). And Sentencing Guidelines cases, like *Snellenberger*, can be applied to immigration. *E.g. Renteria-Morales* v. *Mukasey*,

551 F.3d 1076, 1082 (9th Cir. 2008) (citing *Snellenberger*). The interoperability of the doctrine means that precedents can be mixed and matched, regardless of which statute was at issue in which case. One approach; one body of law. Complex, to be sure, but at least uniform in application.

By creating a side-spur just for ACCA's residual clause, the panel has laid the groundwork for major confusion. This is especially true given that we have already applied the ordinary categorical approach to every other part of the *same statutory sentence*: the enumerated offenses of burglary, *United States* v. *Grisel*, 488 F.3d 844, 850 (9th Cir. 2007) (en banc); arson, *United States* v. *Velasquez-Reyes*, 427 F.3d 1227 (9th Cir. 2005); extortion, *United States* v. *Becerril-Lopez*, 528 F.3d 1133 (9th Cir. 2008); and the use of explosives, *United States* v. *Fish,* 368 F.3d 1200 (9th Cir. 2004). There is nothing whatsoever about the position or language of the residual clause that would suggest different treatment: ACCA defines a crime of violence as an offense that "is burglary, arson, or extortion, involves use of explosives, or *otherwise involves conduct that presents a serious potential risk of physical injury to another*." 18 U.S.C. § 924(e)(2)(B)(ii) (emphasis added). No one reading this definition could predict that the underlined phrase would be treated differently than the rest of the sentence—or explain why. Suddenly, any statutory comma may trigger a doctrinal shift. Whatever happened to *ejusdem generis*? The law in this area is difficult enough without such pointless complexity.

Now, circle back to that question about the legal basis for this needless innovation: There is none. The panel says, quoting *James*, that not "every conceivable factual offense covered by a statute" need fall within the generic federal definition for it to categorically qualify. *Mayer*, 530 F.3d at 1108. True. The Supreme Court said as much in *Duenas-Alvarez*, where it cautioned against unsubstantiated flights of legal imagination. *James*, in fact, cites *Duenas-Alvarez* for this proposition. But a caution against legal imagination has

no relevance to our case because Oregon has *in fact* applied its burglary statute to non-dangerous conduct. The panel is thus interpreting *James* and *Duenas-Alvarez*, decided only three months apart, to require different outcomes depending on whether the case is about immigration or ACCA's residual clause. If this is what the *James* majority had in mind, one would think they would do more than cite *Duenas-Alvarez* with a *cf.*

The panel has dragged us far out of the mainstream. We now have the dubious distinction of being the only federal court in the country to hold that there are two categorical approaches: one for most situations and another one for the ACCA's residual clause. It's going to be a tough regime to administer, and wrong to boot.

**2.** But there's more. Congress didn't intend ACCA "to be all-encompassing," or it wouldn't have included the enumerated crimes at all. *Begay* v. *United States*, 128 S.Ct. 1581, 1585 (2008). The residual clause therefore reaches only those crimes "characteristic of the armed career criminal, the eponym of the statute." *Id.* at 1586 (internal quotation marks and citation omitted). Congress's intent was to combat the "special danger created when a *particular* type of offender" possesses a gun. *Id.* at 1587 (emphasis added). This suggests a narrow residual clause, which is appropriate given the harsh 15-year minimum sentence that ACCA provides.

The panel adopts an argument that stretches the residual clause beyond recognition: Oregon's burglars are dangerous, says the panel, because they might turn violent if apprehended. *Mayer*, 530 F.3d at 1108-09. While the Supreme Court has held that "attempting a break-in" creates a special risk of violent confrontation, *James*, 127 S.Ct. at 1595, Oregon's burglars don't need to break in. As *Keys* illustrates, Oregon has eliminated the unlawful entry requirement. Our colleague, then-Justice Goodwin, worried in dissent that his court had made a burglar of a man who enters a courthouse

intending to perjure himself. *Keys*, 244 Or. at 617. The special danger of a break-in is therefore absent. It's true that a burglar in Portland might turn violent if the police attempt to apprehend him, but so might *any* criminal caught committing *any* serious crime. Accepting this argument turns ACCA into a general sentence enhancement for recidivists and renders the enumerated offenses mere surplusage.

The validity of this "dangerousness at apprehension" theory is not an open question; the Supreme Court just rejected it. *Chambers* v. *United States*, 129 S.Ct. 687 (2009), considered whether failure to report for incarceration is a violent felony under ACCA's residual clause. The government argued that failing to report makes criminals dangerous because they may be violent if apprehended, and "[shoot] at officers attempting to recapture them." *Id.* at 692. This argument, which carried the day in our court, was dismissed by the Supreme Court as "beside the point." In the Court's view, the "question is whether such an offender is significantly *more* likely than others to attack, or physically to resist, an apprehender." *Id.* (emphasis added).

There is nothing about an Oregon burglar that makes him more likely to turn violent if cornered than any other serious felon. If Oregon burglary qualifies under ACCA's residual clause, so does any other serious felony in the nine Western states. This is precisely the result the Supreme Court warned against in *Begay*. The panel manages to create a conflict with *two* recent Supreme Court cases—*Begay* and *Chambers*, the latter only a few weeks old.

\*    \*    \*

We have sown the wind and will reap the whirlwind. Mr. Mayer's the first casualty; he won't be the last.

**OPINION**

N.R. SMITH, Circuit Judge:

The district court properly denied Casey Dale Mayer's motion to suppress, because (1) officers had probable cause to believe that Mayer lived at the residence they searched and (2) the conditions of his probation authorized the search. We also hold that the district court properly found that Mayer's prior conviction for first-degree burglary in Oregon was a predicate "violent felony" under the residual clause of the Armed Career Criminal Act ("ACCA"). In the ordinary case, conduct falling within Oregon's first degree burglary statute presents a serious possibility of risk of physical injury to others. Lastly, the district court properly concluded that Mayer's two prior drug convictions were "serious drug offenses" under the ACCA because Mayer's offenses involved manufacturing and delivering marijuana and Oregon law prescribes a maximum term of imprisonment of ten years or more for such offenses. We have jurisdiction under 28 U.S.C. § 1291. We affirm.

**BACKGROUND**

**I. Factual Background**

In February 2004, Mayer was on both post-prison supervision and probation as a result of two convictions for drug-related offenses.[1] Mayer's probation record indicated that he had lived at 103 Hansen Lane since September 2000. On

---

[1]Mayer was serving post-prison supervision for a conviction, entered on October 8, 2001, in the Circuit Court of the State of Oregon for Lane County of: (i) unlawful manufacture of a controlled substance, (ii) delivery of marijuana for consideration, (iii) unlawful possession of a controlled substance, and (iv) felon in possession of a firearm. Mayer was sentenced to probation for a conviction, entered on February 2, 2004, in the same court for: (i) unlawful manufacture of a controlled substance, and (ii) unlawful delivery of a controlled substance.

August 26, 2003, Mayer informed his Parole and Probation Officer, Melinda Rauch, that he had moved temporarily to a new residence located at 605 Davis Street. Between August 2003 and February 2004, Rauch met with Mayer twice at 605 Davis Street.

On February 24, 2004, one of Mayer's former neighbors from Hansen Lane called Rauch. He informed her that Mayer was again living at 103 Hansen Lane and was likely selling drugs out of the house. Rauch drove by 103 Hansen Lane on several occasions; however, she was not able to personally verify the caller's information.[2] In April 2004, Mayer absconded from probation and post-prison supervision, and two warrants were issued for his arrest.

On December 28, 2004, Parole and Probation supervisor Susan McFarland received an anonymous phone call from a man who refused to identify himself. The man stated (a) that "absconded parolee Casey Mayer" was at 103 Hansen Lane, (b) that he was certain that Mayer had a firearm, and (c) that Mayer was probably growing marijuana. The man expressed fear that Mayer would kill him if Mayer found out that he had called the probation department. He also indicated that Mayer would try to escape out of the back of the house if probation officers knocked on the front door.

McFarland's practice was to use the probation department's database to verify the information from an anonymous caller. McFarland used the database to check Mayer's listed address, prior contacts and convictions, outstanding warrants, and to assess his dangerousness. McFarland also called Rauch, who advised her that there was a high likelihood that Mayer would have weapons in the house and that he would resist arrest.

---

[2]Rauch could not recall the dates on which she attempted to locate Mayer.

McFarland and four other Parole and Probation officers then went to 103 Hansen Lane to execute the two outstanding arrest warrants. When they arrived, McFarland positioned two officers at the front door and sent two other officers to the rear of the house (where the officers entered Mayer's backyard through an open gate) to block the suspected escape route and to cover for the other officers. McFarland then noticed a man and a woman standing directly across the street. When McFarland approached the couple, the man told McFarland that Mayer lived at 103 Hansen Lane, that Mayer lived by himself, and that he had noticed a lot of people going in and out of the house.

McFarland returned to join the officers at the front of the house, who were pounding on the front door and identifying themselves loudly and repeatedly. Although the officers heard someone moving around in the house and the sounds of a television coming from inside the house, no one answered the door.

McFarland then went to the back of the house to check on the other two officers. While in the backyard, she observed an 18-inch gap in the backyard fence, which she believed to be the escape route described by the anonymous caller. McFarland also observed a bright light emanating from a plastic vent in the house's foundation, and she heard a loud electrical buzzing noise coming from behind the vent. McFarland peeked through a slit in the vent, saw a marijuana plant, and smelled marijuana.

While McFarland was at the back of the house, one of the officers (positioned at the front of the house) heard sounds coming from the attic and called the sheriff's department to request back-up assistance. When the sheriff's deputies arrived, McFarland told Deputy Sheriff Eric Franklin about her observations at the rear of the house. Franklin positioned himself at the back of the house, outside of the fence. Franklin had a photograph of Mayer that he handed through the slats

in the fence to Deputy Sheriff David Thomas, who was stationed in the backyard. Thomas told Franklin that he had seen Mayer inside of the house. Franklin then crossed the fence and went into the backyard, where he observed a marijuana plant, smelled the odor of growing marijuana, and saw a PVC pipe consistent with a hydroponic marijuana growing operation.

Approximately 1.5 hours after the probation officers arrived, Mayer and his brother came out of the house. Mayer admitted that there was marijuana growing inside the house, but denied the presence of firearms. He also refused to consent to a search of the residence.

Deputy Marvin Combs then applied for, and obtained, a search warrant based on information that Franklin provided over the telephone. The subsequent search revealed marijuana, items associated with growing marijuana, a .45 caliber pistol in the attic, and a box of .45 caliber ammunition in the bedroom.

## II.   Procedural History

On July 21, 2005, Mayer was indicted for being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1), as enhanced under the ACCA. On November 18, 2005, Mayer filed a motion to suppress the firearm. On March 8, 2006, following a suppression hearing, the district court denied the motion. On June 30, 2006, Mayer entered a conditional guilty plea pursuant to Federal Rule of Criminal Procedure 11(a)(2), expressly reserving in writing the right to appeal the denial of his suppression motion.

The government argued that the district court should enhance Mayer's sentence under the ACCA, because Mayer had one prior conviction for a violent felony and two prior convictions for serious drug offenses. The ACCA imposes a special mandatory 15-year prison term upon felons who

unlawfully possess a firearm and who also have three or more previous convictions for " 'a violent felony or a serious drug offense.' " *United States v. Jennings*, 515 F.3d 980, 987 (9th Cir. 2008) (quoting 18 U.S.C. § 924(e)(1)). On July 13, 2007, following a sentencing hearing, the district court determined that Mayer's prior convictions were qualifying offenses under the ACCA, and sentenced Mayer to 180 months imprisonment, followed by five years of supervised release.

## STANDARDS OF REVIEW

We review de novo a district court's denial of a motion to suppress. *United States v. Lopez*, 474 F.3d 1208, 1212 (9th Cir. 2007). We review a district court's underlying factual findings for clear error. *Id.* We may affirm the denial of a motion to suppress "on any basis fairly supported by the record." *United States v. Todhunter*, 297 F.3d 886, 889 (9th Cir. 2002) (internal quotation marks omitted). We also review de novo whether a prior conviction is a predicate felony under the ACCA. *United States v. Grisel*, 488 F.3d 844, 846 (9th Cir. 2007) (en banc).

## DISCUSSION

### I. Motion to Suppress

Mayer first argues that the officers illegally entered his backyard and that, consequently, their observations of criminal activity were tainted. Mayer therefore contends that the officers' observations while in his backyard were improperly included in the affidavit supporting the search warrant. We disagree.

[1] In determining whether a search is reasonable, we examine the "totality of the circumstances" in a "common-sense" manner. *United States v. Diaz*, 491 F.3d 1074, 1078 (9th Cir. 2007). Because probationers enjoy only a "conditional liberty properly dependent on observance of special

[probation] restrictions," states may constitutionally permit probation officers to conduct searches without a warrant and with less than probable cause. *Griffin v. Wisconsin*, 483 U.S. 868, 873-880 (1987) (alteration in original) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 480 (1972)). Thus, warrantless searches of probationers' residences are permissible under the Fourth Amendment when they are authorized by a condition of probation and supported by reasonable suspicion of criminal activity. *United States v. Knights*, 534 U.S. 112, 121-22 (2001).

**[2]** Even though officers only entered Mayer's backyard during the probation search, the conditions of Mayer's probation authorized a warrantless search of his entire residence. One condition of Mayer's probation was that he "[p]ermit the probation officer to visit [him] or [his] work site or residence and to conduct a walk-through of the common areas and of the rooms in the residence occupied by or under [his] control." Another condition was that he had to "[c]onsent to the search of person, vehicle or premises upon . . . request . . . if the supervising officer has reasonable grounds to believe that evidence of a violation will be found."

**[3]** There is no doubt that the Parole and Probation officers had a "reasonable suspicion" of criminal activity. Parole and Probation officers received two phone calls — one from a neighbor and one from an anonymous source — in which the callers reported that Mayer was selling marijuana, and that he was in possession of a firearm.

**[4]** Before law enforcement officers may conduct a warrantless probation search, however, they must also have probable cause to believe that the probationer actually lives at the residence searched. *See United States v. Howard*, 447 F.3d 1257, 1262 (9th Cir. 2006); *Motley v. Parks*, 432 F.3d 1072, 1079-80 (9th Cir. 2005) (en banc). In *Illinois v. Gates*, 462 U.S. 213, 233-34, 243-46 (1983), the Supreme Court held that probable cause may be established based on a tip from an

anonymous informant if there are sufficient indicia of reliability. Such indicia include the informant's history of providing accurate information on previous occasions, a detailed description of the alleged wrongdoing that the informant witnessed first-hand, the provision of details not easily obtained or predicted, or the police's ability to corroborate the information. *Id.*

**[5]** The district court correctly determined that the officers had probable cause to believe that Mayer resided at 103 Hansen Lane on the day of the search. First, Mayer had previously resided at the Hansen Lane address, providing some basis for the officers to believe that he might be residing there again. When Mayer reported his change of address to the Davis Street address, he indicated that the move was "temporary." The fact that Mayer had absconded from probation presumably meant that Rauch had been unable to locate Mayer at the Davis Street address.

**[6]** Second, in February 2004, one of Mayer's Hansen Lane neighbors called Rauch to report that Mayer was residing at 103 Hansen Lane and likely selling drugs from the residence. Although this information was provided by an informant, Rauch testified that she knew the neighbor's name and address, had known him for a long time, and trusted him. The information provided by the neighbor was consistent with Mayer's previous convictions for marijuana offenses, and it tended to show that Mayer was living at the Hansen Lane address. *See Gates*, 462 U.S. at 243-45.

**[7]** Third, on the day of the search, McFarland received an anonymous phone call informing her that Mayer could be found at 103 Hansen Lane. The caller knew that Mayer had absconded from probation, believed Mayer had a gun and a marijuana growing operation, and knew about a possible escape route through the backyard. These facts were arguably specific details not readily known by the public, and they were corroborated by Mayer's previous residence at 103 Han-

sen Lane, his history of marijuana and firearms offenses, the fact that he had actually absconded from parole, and McFarland's subsequent observation of a possible escape route. *See id.* at 234, 243-45.

**[8]** Finally, before McFarland entered the backyard of 103 Hansen Lane, a man who lived directly across the street told her that Mayer lived there alone. This provided further corroboration that Mayer was actually living at the Hansen Lane address.[3] Thus, under the totality of the circumstances, the officers had probable cause to believe that Mayer was living at 103 Hansen Lane on the date of the search. Accordingly, we hold that the district court correctly ruled that the officers' warrantless entry into Mayer's backyard did not violate his Fourth Amendment rights, and the officers' observations of criminal activity were properly included in the affidavit supporting the search warrant.

We next turn to Mayer's argument that the district court erred by failing to suppress the firearm found in his residence. As discussed above, the officers could have conducted a constitutionally permissible warrantless search of Mayer's entire residence. The officers, however, went an extra step and obtained a search warrant before entering Mayer's residence. "A search warrant, to be valid, must be supported by an affidavit establishing probable cause." *United States v. Jawara*, 474 F.3d 565, 582 (9th Cir. 2007) (internal quotation marks

---

[3]Mayer asserts that the district court should not have relied on this information because, by the time that McFarland spoke with the neighbor, other officers had already entered the backyard and made tainted observations of the marijuana growing operation. That argument is not persuasive, however, because the affidavit for the search warrant was based only on information provided by McFarland (who at that point in time had not yet entered the backyard or talked to any officer who had), and Deputies Franklin and Thomas (who were not yet at the scene). *See Segura v. United States*, 468 U.S. 796, 814-15 (1984) (holding that evidence obtained by officers prior to their illegal entry was not subject to exclusion).

omitted) (quoting *United States v. Stanert*, 762 F.2d 775, 778 (9th Cir. 1985)).

**[9]** Even if the conditions of Mayer's probation had not authorized the search of his residence, the totality of the circumstances indicate that the search warrant was supported by probable cause. *See Gates*, 462 U.S. at 230-31. The affidavit supporting the search warrant established that, in Mayer's backyard, officers had heard a loud buzzing noise, observed growing marijuana, smelled the odor of growing marijuana, and saw a PVC pipe consistent with a hydroponic marijuana growing operation. Although these observations alone sufficiently established probable cause for the search warrant, they also corroborated the information received by Parole and Probation officers from informants, further supporting probable cause. Additionally, Mayer admitted that there was marijuana in the house after he and his brother came outside. The district court therefore properly held that the search of Mayer's residence did not violate the Fourth Amendment, and properly denied Mayer's motion to suppress the firearm.

## II.   Predicate Offenses Under the ACCA

**[10]** "The Armed Career Criminal Act imposes a special mandatory 15-year prison term upon felons who unlawfully possess a firearm and who also have three or more previous convictions for committing certain drug crimes or 'violent felon[ies].' " *Begay v. United States*, 128 S. Ct. 1581, 1583 (2008) (brackets in original) (quoting 18 U.S.C. § 924(e)(1)). The district court held that Mayer's prior burglary conviction was a "violent felony" under the ACCA, and that Mayer's other two prior convictions were "serious drug offenses" under the ACCA.

### A.   Mayer's Burglary Conviction

**[11]** Mayer argues that the district court erred by holding that his 1994 Oregon conviction for first-degree burglary

qualified as a predicate "violent felony." The ACCA defines a "violent felony" as any crime punishable by imprisonment of more than a year that: (i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or (ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another. *See* 18 U.S.C. § 924(e)(2)(B).

**[12]** To determine whether Mayer's state conviction for burglary constitutes generic "burglary" under the ACCA, we first apply the categorical approach set forth in *Taylor v. United States*, 495 U.S. 575, 599-602 (1990). Under the categorical approach, we look only to the state's statutory definition of the crime, and not to the specific conduct underlying the conviction. *See United States v. Wenner*, 351 F.3d 969, 972 (9th Cir. 2003). A state conviction is a predicate "burglary" offense if it has "the basic elements of unlawful or unprivileged entry into, or remaining in, a building or structure, with intent to commit a crime." *Taylor*, 495 U.S. at 599.

Under Oregon law, a person commits first-degree burglary if he

> violates [the second degree burglary statute] and the building is a dwelling, or if in effecting entry or while in a building or in immediate flight therefrom the person: (a) Is armed with a burglary tool or theft device . . . or a deadly weapon; (b) Causes or attempts to cause physical injury to any person; or (c) Uses or threatens to use a dangerous weapon.

Or. Rev. Stat. § 164.225(1). A person commits second-degree burglary if he "enters or remains unlawfully in a building with intent to commit a crime therein." Or. Rev. Stat. § 164.215(1). A "building" is, "in addition to its ordinary meaning . . . any booth, vehicle, boat, aircraft or other structure adapted for overnight accommodation of persons or for carrying on busi-

ness therein." Or. Rev. Stat. § 164.205(1). A "dwelling" in Oregon is defined as a "building which regularly or intermittently is occupied by a person lodging therein at night, whether or not a person is actually present." Or. Rev. Stat. § 164.205(2).

**[13]** Oregon Revised Statutes section 164.225 is therefore broader than the definition of generic burglary because the statute does not limit burglary to "building[s] or structure[s]," but also includes non-structures (such as booths, vehicles, boats, and aircraft) that are regularly or intermittently used as lodgings. *Cf. Taylor*, 495 U.S. at 599. Although we held in *United States v. Hunt*, 925 F.2d 1181 (9th Cir. 1991), that first-degree burglary under Oregon Revised Statutes section 164.225 was categorically a generic burglary, *Hunt* has been undermined by our subsequent en banc opinion in *United States v. Grisel*, 488 F.3d 844 (9th Cir. 2007) (en banc).

**[14]** In *Grisel*, we held that Oregon's second-degree burglary statute defined burglary more broadly than the generic definition because it included entries into booths, vehicles, boats, or aircraft. *See id.* at 850-52. In so holding, we explained that, in *Taylor*, the Supreme Court made clear that the generic term "building or structure" was limited to structures designed for occupancy and intended for use in one place. *See Grisel*, 488 F.3d at 848-49. In *Grisel*, we also expressly overruled prior cases, including *United States v. Sweeten*, 933 F.2d 765 (9th Cir. 1991), which had held that non-buildings (such as vehicles) adapted for overnight accommodation qualified as generic "building[s] or structure[s]." *Id.* at 851 n.5. Although our en banc opinion in *Grisel* did not expressly overrule *Hunt*, the two cases are irreconcilable because Oregon's first-degree burglary statute also encompasses Oregon's second-degree burglary statute. Thus, first degree burglary in violation of Oregon Revised Statutes section 164.225 does not categorically satisfy the generic definition of burglary. *See* Or. Rev. Stat. §§ 164.205(1)-(2), 164.225(1).

**[15]** As discussed, the ACCA enumerates four violent felonies as predicate offenses for the fifteen year minimum sentence: burglary, arson, extortion, and offenses involving the use of explosives. *See* 18 U.S.C. § 924(e)(2)(B)(ii). A non-enumerated offense, however, may categorically qualify as a predicate violent felony under the ACCA's "residual clause"[4] if it "otherwise involves conduct that presents a serious potential risk of physical injury to another," and is similar to an enumerated predicate felony. *Id.*; *see Begay*, 128 S. Ct. at 1585-86.

We apply the categorical approach to determine whether an offense poses a serious potential risk of physical injury. *See James v. United States*, 127 S. Ct. 1586, 1593-94 (2007). Our inquiry is *not* whether "every conceivable factual offense covered by a statute" presents a serious potential risk of physical injury, but rather whether, "in the ordinary case" conduct falling within the state statute presents such a risk. *Id.* at 1597. In the context of state burglary statutes, the Supreme Court explained:

> The main risk of burglary arises not from the simple physical act of wrongfully entering onto another's property, but rather from the possibility of a face-to-face confrontation between the burglar and a third party — whether an occupant, a police officer, or a bystander — who comes to investigate. That is, the risk arises . . . from the possibility that an innocent person might appear while the crime is in progress.

*Id.* at 1594-95.

The Supreme Court has rejected arguments that canons of statutory construction require an interpretation of the residual clause that only allows burglary to qualify as a violent felony

---

[4]This circuit also refers to the "residual" clause as the "catchall" clause or the "otherwise" clause. *Jennings*, 515 F.3d at 990.

under the residual clause if it constitutes generic burglary under the *Taylor* definition. In *James*, the Supreme Court explained that the residual clause may "cover conduct that is outside the strict definition of, but nevertheless similar to, generic burglary." *James*, 127 S. Ct. at 1600 (citing *Taylor*, 495 U.S. at 600 n.9). The Supreme Court has explained that Congress did not intend the enumerated offenses in the ACCA to be an exhaustive list of qualifying predicate offenses, reasoning that Congress singled out the enumerated offenses because, despite technically being property offenses, they often created a significant risk of bodily injury. *See James*, 127 S. Ct. at 1592-93. Most recently, the Supreme Court has explained that the four enumerated felonies in § 924(e)(2)(B)(ii) "illustrate the kinds of crimes that fall within the [ACCA's] scope." *Begay*, 128 S. Ct. at 1585. Although the ACCA does not cover "*every* crime that presents a serious potential risk of physical injury to another," it does cover crimes "*similar*" to the ACCA's listed examples. *Id.* (internal quotation marks omitted).

We previously declined to adopt an interpretation of the residual clause under the categorical approach or the modified categorical approach to cover offenses that were similar to an enumerated offense, because such an interpretation would render the ACCA's inclusion of the enumerated offenses in the same section to be "surplusage." *United States v. Fish*, 368 F.3d 1200, 1204 (9th Cir. 2004) (noting that an interpretation of "the catchall clause under the categorical approach to cover possession of a 'destructive device' . . . or under the modified categorical approach to cover possession of a 'pipe bomb,' would render the provision's specific inclusion of 'use of explosives' in the same section surplusage"). *Fish* does not, however, prevent us from finding that a non-enumerated offense falls under the ACCA's residual clause when the non-enumerated offense "is outside the strict definition of, but nevertheless similar to, generic burglary." *See James*, 127 S. Ct. at 1600. Accordingly, we may find that Oregon's first-degree burglary statute falls under the ACCA's residual

clause if it does not implicate the statutory construction concerns found in *Fish*. We conclude that Oregon's first-degree burglary statute does not implicate those concerns.

**[16]** Fish's conviction for possessing a pipe bomb could not fall under the ACCA's residual clause, because the ACCA explicitly prohibits "use," but says nothing about "possession" of explosives, and we could not square this omission with the residual clause without making the "use" language superfluous. *Fish*, 368 F.3d at 1204. Mayer's conviction under Oregon's first-degree burglary statute, however, does not implicate the same concern, and is exactly the type of crime Congress intended to include under the ACCA. Mayer was convicted of an offense that is very similar, though not identical, to the generic burglary offense. We do not render any part of the ACCA superfluous by finding Oregon first-degree burglary similar to generic burglary, and, therefore, consistent with the ACCA's residual clause.

The analysis turns on both the plain language of state statutes and how state courts actually apply them. *See James*, 127 S. Ct. at 1594.[5] Mayer's argument that Oregon's definition of burglary does not categorically pose a serious potential risk of physical injury, because a person may commit the offense in ways that pose little or no risk of face-to-face confrontation, is unpersuasive. A person could theoretically be convicted under section 164.225 based on facts that seem inherently non-confrontational, such as by entering a building that is not adapted for overnight accommodation or business (*e.g.*, an

---

[5]It is not clear how narrowly Congress intended the residual clause to be interpreted. *See James*, 127 S. Ct. at 1591-93 (explaining that neither the plain language of the residual clause nor its legislative history supported a narrow interpretation); *see also Taylor*, 495 U.S. at 588-90, 596-99 (explaining that, in enacting the ACCA, Congress was concerned with offenses that created an inherent potential for harm to people). *But cf. Begay*, 128 S. Ct. at 1586 (explaining that Congress did not intend the residual clause to cover every offense that involved a substantial risk of physical force against the person or property of another).

abandoned structure), while in possession of a burglary tool or theft device. *See State v. Warner*, 298 Or. 640 (1985) (first-degree burglary conviction for breaking into a locked barn with a metal signpost was reversed on the ground that the signpost was not a "burglary tool or theft device"). It is unlikely, under those facts, that the burglar would have a face-to-face confrontation with an occupant of the building, since there are no occupants. It is therefore possible to imagine a scenario in which a violation of Oregon Revised Statutes section 164.225 does not pose a realistic risk of confrontation or injury, as it is in all burglary cases.

   **[17]** The Supreme Court, however, has made it clear that the risk of face-to-face confrontation stems not only from encountering the occupant of a building, but also from — for example — a police officer or bystander who comes to investigate. *See James*, 127 S. Ct. at 1594-95. Additionally, the law does not require "every conceivable factual offense covered by a statute" to present a serious potential risk of physical injury. *Id.* at 1597. Most of the cases applying Oregon Revised Statutes section 164.225 involve entries into places that are occupied, or are likely to be occupied, by people. *See, e.g.*, *State v. Kautz*, 39 P.3d 937 (Or. Ct. App. 2002) (entry into workshop located near victims' home); *State v. Sigman*, 919 P.2d 45 (Or. Ct. App. 1996) (entry into occupied motor home); *State v. McDonald*, 712 P.2d 163 (Or. Ct. App. 1986) (entry into a travel trailer parked in the owner's driveway); *State v. Spencer*, 545 P.2d 611 (Or. Ct. App. 1976) (entry into a fishing vessel; defendant conceded that the vessel was a dwelling).[6] The risk of a physical confrontation resulting from a burglar's entry in these cases is comparable to that posed by

---

   [6]There is, however, no case law narrowing the statute to *require* entry into a place likely to be occupied by a person. *Cf. James*, 127 S. Ct. at 1594 (concluding that although the statutory language of Florida's attempted burglary statute was broad, the Florida courts had considerably narrowed it to require an overt act, rather than merely preparatory activity that posed no real danger of harm to others).

a burglar's entry into a generic "building or structure." *See James*, 127 S. Ct. at 1594-95. A burglar's entry also typically involves, much like generic burglary, the kind of "purposeful, violent, and aggressive conduct" that makes it more likely that the "offender, later possessing a gun, will use the gun deliberately to harm a victim." *Begay*, 128 S. Ct. at 1586.

**[18]** Under Oregon Revised Statutes section 164.235(2), a "burglary tool or theft device" is by definition a very dangerous object.[7] Therefore, even if there is a reduced risk of physical confrontation (*e.g.*, because the building is abandoned), if a confrontation does occur then there is a serious potential risk that it will result in physical injury to another. *See United States v. Rendon-Duarte*, 490 F.3d 1142, 1147 (9th Cir. 2007) (explaining that "conduct involving a dangerous instrument create[s] significant risks of bodily injury or confrontation that might result in bodily injury" (brackets in original) (internal quotation marks omitted)).

For these reasons, the district court did not err by determining that first-degree burglary under Oregon Revised Statutes section 164.225 is categorically a "violent felony" under the ACCA's residual clause.[8] Although our interpretation of the

---

[7]Oregon Revised Statutes section 164.235(2) defines a "burglary tool or theft device" as "an acetylene torch, electric arc, burning bar, thermal lance, oxygen lance or other similar device capable of burning through steel, concrete or other solid material, or nitroglycerine, dynamite, gunpowder or any other explosive, tool, instrument or other article adapted or designed for committing or facilitating a forcible entry into premises or theft by a physical taking".

[8]The district court did not rule on whether Mayer's first-degree burglary conviction was generic burglary under the modified categorical approach. We generally adopt a modified categorical approach once a determination has been made that an offense does not categorically qualify as a crime of violence. *See Shepard v. United States*, 544 U.S. 13, 26 (2005). We then expand the inquiry to include "the terms of the charging document, the terms of a plea agreement or transcript of colloquy between judge and defendant in which the factual basis for the plea was confirmed by the

residual clause encompasses state statutes that define burglary more broadly than generic burglary, we do not intend to subsume offenses in which there is little risk of physical injury. The Supreme Court limited the scope of the residual clause to encompass only those felonies that — in addition to presenting a serious potential risk of physical injury — are similar to the four enumerated felonies and that involve the "deliberate kind of behavior associated with violent criminal use of firearms." *Begay*, 128 S. Ct. at 1587.

**[19]** We therefore hold that first-degree burglary under Oregon Revised Statutes section 164.225 categorically poses a serious potential risk of physical injury to people present in a dwelling at the time of a burglary, and to people in the immediate area of a building if a confrontation does occur. The risk of potential injury due to a face-to-face confrontation between the burglar and a third party is not lessened simply because, under Oregon law, the dwelling does not have to be a generic "building" or "structure," or because the offense does not necessarily involve fleeing the scene of a burglary. "[I]n the ordinary case," a violation of Oregon Revised Statutes section 164.225 will involve conduct that presents a serious potential risk of physical injury to another, in a manner similar to generic burglary. *James*, 127 S. Ct. at 1597; *see Begay*, 128 S. Ct. at 1584-85. Interpreting the ACCA's resid-

---

defendant, or to some comparable judicial record of this information." *Id*. We have previously concluded "that generally the modified categorical approach may be applied in determining whether a conviction qualifies as a violent felony under § 924(e)(2)(B)(ii)'s 'otherwise' clause . . . [even though] we have expressed doubt [in the past] as to whether the modified categorical approach applies to the catchall clause in U.S.S.G. § 4B1.2(a), as well as in § 924(e)(2)(B)(ii)." *Jennings*, 515 F.3d at 990. Although we may affirm on any ground supported by the record, *see United States v. Cortez-Arias*, 403 F.3d 1111, 1114 n.7 (9th Cir. 2005), we find that an analysis of the modified categorical approach is unnecessary due to our determination that the offense categorically qualifies as a crime of violence under the residual clause.

ual clause to include Oregon Revised Statutes section 164.225 does not therefore extend its coverage in an unlimited manner.

## B. Mayer's Prior Drug Convictions

The ACCA defines a "serious drug offense" as "an offense under State law, involving manufacturing, distributing, or possessing with intent to manufacture or distribute, a controlled substance . . . for which a maximum term of imprisonment of ten years or more *is prescribed by law*." 18 U.S.C. § 924(e)(2)(A)(ii) (emphasis added). Mayer contends that his two prior Oregon convictions for unlawful manufacture and delivery of marijuana were not "serious drug offenses" under the ACCA, because Oregon law does not "prescribe" a maximum term of imprisonment of ten years or more for those offenses. Mayer reasons that, although the statutory maximum sentence for these offenses is more than ten years,[9] the maximum sentence that may actually be imposed under Oregon's sentencing guidelines is only 90 months.

**[20]** Mayer's argument is foreclosed by *United States v. Parry*, 479 F.3d 722 (9th Cir. 2007).[10] In *Parry*, we held that, for purposes of determining whether a prior drug conviction is a "serious drug offense" under the ACCA, the maximum sentence "prescribed by law" is that which is set forth by the statute of conviction, and not by the state sentencing guidelines. *Id.* at 724-26; *see also United States v. Murillo*, 422

---

[9]Under Oregon Revised Statutes sections 161.605(1), 475.840(1)(a), and 475.856(2), the statutory maximum sentence for manufacture or delivery of marijuana is 20 years. Although Mayer's indictments for these offenses refer to violations of Oregon Revised Statutes section 475.992, that provision was subsequently renumbered.

[10]The defendant in *Parry* argued, similar to Mayer in this case, that "under the Oregon Sentencing Guidelines, no defendant could ever be sentenced to 10 years in prison for delivery or manufacture of a Schedule II controlled substance . . . regardless of his criminal history. Instead, the maximum sentence for that crime under the guidelines is 90 months." 479 F.3d at 724.

F.3d 1152, 1155 (9th Cir. 2005) (holding that, for purposes of determining whether a state criminal conviction is a crime punishable by a term exceeding one year under 18 U.S.C. § 922(g)(1), the maximum sentence is defined by the state criminal statute, not the maximum possible sentence that could have been imposed on the defendant under the state's sentencing guidelines). We expressly rejected the statutory construction argument that Mayer now raises, explaining:

> It is true that 18 U.S.C. § 922(g) requires that the predicate offense be "*punishable* by imprisonment for a term exceeding one year," while ACCA requires, for a "serious drug offense," a "maximum term of imprisonment of ten years or more" as "*prescribed by law*," 18 U.S.C. § 924(e)(2)(A)(ii). Although the phrasing differs slightly, we conclude that neither formulation suggests that we look to sentencing guidelines to the exclusion of the statutes. If anything, "punishable" would appear to point more specifically to time spent in prison, while "prescribed by law" would appear to point more to the statute. If the former phrase requires that we use the statutory maximum, a fortiori, the latter phrase does too.

*Parry*, 479 F.3d at 726.

Although Mayer contends that *Parry* was wrongly decided, it is clear that *Parry* is controlling precedent in our circuit. *See*, *e.g.*, *United States v. Crampton*, 519 F.3d 893, 899 (9th Cir. 2008) (holding that *Parry* foreclosed the defendant's argument that the maximum sentence "prescribed by law" was the lower maximum sentence under Oregon's sentencing guidelines); *United States v. Ankeny*, 502 F.3d 829, 839 (9th Cir. 2007) (same). Even if we agreed with Mayer that *Parry* was wrongly decided, a three-judge panel may not overrule the decision of another panel in the absence of intervening

Supreme Court case law that is "clearly irreconcilable." *Miller*, 335 F.3d at 900.

**[21]** Because Oregon law prescribes a maximum sentence of ten years or more for Mayer's prior convictions for unlawful manufacture and delivery of marijuana, the district court did not err by finding that those convictions were "serious drug offenses" under the ACCA. *See* 18 U.S.C. § 924(e)(2)(A)(ii). Accordingly, the district court correctly imposed the ACCA's mandatory fifteen year sentence, because Mayer was a felon having three or more previous convictions for "a violent felony or a serious drug offense." *See Jennings*, 515 F.3d at 987.

## CONCLUSION

We affirm the district court's denial of Mayer's motion to suppress. We also affirm the district court's imposition of the ACCA's mandatory fifteen year minimum sentence.

AFFIRMED.